# Richmond.

## DIRECTOR GENERAL OF RAILROADS v. J. L. BLUE.

### November 17, 1921.

#### REHEARD NOVEMBER 16, 1922.

1. CROSSINGS—*Speed Limit—Ringing Bell—Violation of Ordinance.*—A railroad company is guilty of primary negligence in running an engine at a speed in excess of the lawful speed limit prescribed by an ordinance and in failing to ring the bell as the engine approached a crossing as required by an ordinance.

2. CROSSINGS—*Contributory Negligence—Looking only One Way when Approaching Crossing.*—Plaintiff, in an action for injuries sustained at a railroad crossing, was guilty of contributory negligence in failing to observe the approach of an engine before he went upon the track where he was struck and injured, where his view was unobstructed for a distance of about 1,200 feet in the direction from which the engine was approaching. And this notwithstanding that plaintiff was struck on the southbound track by an engine running backwards and going north on that track, and plaintiff testified that he stopped and looked south to see if any train was approaching from the south and saw none.

3. NEGLIGENCE—*Last Clear Chance—Injuries on or near Railroad—General Doctrine.*—When the engineman or other person in charge of a moving engine or car sees a person in apparent possession of his faculties on the track, or so near thereto that he will probably be injured or killed unless he changes his position, he has the right to assume that he will change his position in time for his own safety until the approach is so close that an engineman of ordinary care and prudence would be admonished of his peril, and if he then gives no evidence of consciousness of his peril, it is the duty of such engineman or person in charge to give timely and suitable warning of the approach of such engine or car, and if the warning appears to be unheeded to use all other means within his power, consistent with his higher duty to other persons, to avoid injury to one who has thus exposed himself.

4. CROSSINGS—*Last Clear Chance—Failure to Give Warning and Attempt to Stop—Case at Bar.*—In the instant case plaintiff was struck at a city crossing on the southbound track of defendant railroad by an engine running backwards, going north on that track. An employee was placed as a lookout on a step on the end of the engine nearest to the

crossing. When the engine came in sight of a crossing, about 1,200 feet away, and until it struck plaintiff, the lookout was whistling through his teeth, evidently adopting that as a method of alarm in lieu of the ringing of the bell as required by the city ordinance. It was obvious to the lookout that plaintiff, approaching the crossing, was unconscious of his danger and had failed to notice his whistling as a danger signal, and had not heard the noise of the engine, and was in grave peril.

*Held:* That, under the circumstances, it was the plain duty of the lookout man to have notified the engineman of plaintiff's peril, so that a louder alarm might have been given, and, if unheeded, the engine might have been stopped or its speed slackened; that the engine was far enough away for this to have been done by the exercise of reasonable diligence; and that if any one of these steps had been taken, plaintiff would not have been injured.

### ON REHEARING.

5. CROSSINGS—*Last Clear Chance—Time to Avert Accident after Plaintiff has Actually Crossed the Danger Line.*—The original decision in the instant case to the effect that the jury would have been warranted in finding that the defendant had the last clear chance to prevent the accident was not rested upon the theory that there was time enough for the employees of the company to avert the accident after the plaintiff had actually crossed the danger line, but that the jury would have been warranted in finding that before the plaintiff had reached a point which brought him within the overhang of the engine, it ought to have been apparent to the lookout man that the plaintiff was unconscious of its approach and that a collision, if not inevitable, was highly probable, unless some more effective signal was given, or unless the speed of the engine was reduced; that when this situation developed there was still ample time and opportunity to give such signals, to reduce the speed, and, if necessary, to stop the engine; and that no effort was made to do either of these things.

6. CROSSINGS—*Last Clear Chance—Plaintiff's Position of Obvious Danger.*— In the instant case, an accident at a crossing, defendant contended that plaintiff was not actually in a position of danger until he came within the overhang of the engine.

*Held:* That a man who is obviously walking heedlessly from safety into immediate danger is in imminent peril.

7. CROSSINGS—*Last Clear. Chance—Presumption that Pedestrian will not Place Himself in a Position of Peril.*—While, undoubtedly, the general rule is that when those in charge of a train or engine see a traveler approaching a crossing in apparent possession of his faculties, and situated so he can see the engine, they may presume that he will stop before he places himself in a position to be injured, but this pre-

sumption ceases when the obvious facts or circumstances are to the contrary, and are such as to indicate that the traveler is not aware of the approaching train, and the employees running a train have no right to presume that a traveler will stop before he enters the zone of danger when his obvious position and conduct are such as to indicate that he will not stop.

8. LAST CLEAR CHANCE—*Party on Verge of Stepping Heedlessly into Danger.* —The reason of the thing, as well as the uniform course of authority, leads irresistibly to the conclusion that the doctrine of the last clear chance applies just as well when it is apparent that a person is on the verge of stepping heedlessly into danger as when it appears that he is likely not to change his position so as to get out of danger. The doctrine is founded in humane considerations, and there is no reason for making a distinction between cases of the former and latter type.

9. LAST CLEAR CHANCE—*Presumption that Traveler will Use Due Care—When the Presumption Ceases to Operate—Question for Jury.*—If there be inquiry as to just when the presumption that a traveler on or approaching a railroad track will use due care, ceases to operate as an excuse for a failure on the part of trainmen to take active steps for his protection, the answer is that no inflexible rule can be laid down. Every case must be decided upon its own facts. To the ordinary and usual situation of a traveler on or approaching the track, there must be supperadded circumstances sufficient to charge an ordinarily prudent man with some sense of danger. It matters not how an engineman is admonished of the peril. If the evidence leaves it doubtful, the question is one for the jury.

Error to a judgment of the Corporation Court of the city of Charlottesville in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

In this case (an action for damages by the defendant in error as plaintiff in the court below against the plaintiff in error as defendant in the court below) there was a trial by jury; a demurrer to the evidence by the defendant, and a verdict in favor of the plaintiff, subject to the demurrer. The trial court overruled the demurrer and entered judgment in accordance with the verdict. This action of the trial court is the sole assignment of error.

The evidence, not the facts, is certified. The defend-

ant introduced no evidence. Considering the evidence under the rule applicable upon the demurrer of the defendant thereto, the material facts are found to be as follows:

On the evening of July 4, 1919, after supper, but in full daylight, the plaintiff, a man between sixty-five and sixty-six years old, was struck and injured by an engine of the Southern Railway (being operated at the time by the Director General) at a grade crossing of a considerably used street in the city of Charlottesville. The railroad in this locality runs approximately north and south and consists of two main line tracks, the north bound track to the east and next to that the south bound track, to the west, those tracks being a distance of about twenty-five feet between the inner rails, and of about twenty feet between the tracks themselves. The street crosses these tracks somewhat obliquely in an approximately northwesterly and southeasterly direction. The plaintiff was struck on the south bound track by the engine of the railroad, running backwards, going north on that track, as the plaintiff was walking along the street from the southeasterly going in the northwesterly direction. The plaintiff was very tired from a hard day's work and was walking very slowly. He was in full possession of all of his faculties, except that he was somewhat deaf, but could at the time hear the whistle or the bell of an engine very distinctly. As he came to a point about fifteen feet from the north bound track he stopped and looked south to see if any train was approaching from the south and saw none. Both tracks were in clear view of the plaintiff from that point for a distance of about 1,200 feet, if he had looked that far south along the tracks. From the physical facts shown in evidence we must conclude that the engine was plainly within sight of the plaintiff when he stopped at

the point last named and would have been seen by him had he looked as far south as he could have done.    How far away from the crossing the engine then was, the evidence does not definitely show, nor its exact speed, but it was some considerable distance south of the crossing, more probably at least 250 yards or 750 feet away, and was running approximately about fifteen miles an hour, according to the preponderance of the evidence.    The engineman was in his place, the fireman in his place, and a *brakeman* was standing on the lookout on a step on the end of the engine nearest to the crossing; but none of them testified in the case.    There were ordinances of the city of Charlottesville which fixed the speed limit of the engine at ten miles an hour, and which required that the engine bell should be rung continuously, while the engine was approaching the crossing.    The speed of the engine exceeded such speed limit and no bell was rung at any time while the engine was approaching the crossing; nor was any whistle blown.    When the engine came in sight of the crossing, about 1,200 feet away, and from that time until the engine reached the crossing and struck the plaintiff, the *brakeman*, standing as a lookout man on the step of the end of the engine approaching and nearest to the plaintiff, was whistling through his teeth, evidently adopting that as a method of alarm in lieu of the ringing of the bell required by the city ordinance.    Not observing the engine approaching from the south, the plaintiff, after stopping at the place aforesaid, then started on, looking toward the north as he crossed the north bound track, to see if anything was approaching from that direction, and, after crossing the north bound track, continued on, with his gaze turned northward along the south bound track, as he was not accustomed, as he testified, to seeing any train moving north on the south bound track, and so felt safe from

trains going north after he had crossed the north bound track.    He continued, without again stopping, or again looking south, without hearing the engine or the whistling of the lookout man, steadily walking on, until, just as he came upon the south bound track the engine, without slacking its speed at all until the impact occurred, struck him, causing the injuries complained of.    The engine knocked the plaintiff along the track only about twenty-two feet, however, throwing him to the east of the track and not upon it, and the engine passed partly beyond where he lay on the ground and was stopped within its own length (which was 184 feet), after it struck the plaintiff.    During the whole time that the plaintiff was walking steadily onward from the place at which he stopped, as aforesaid, until he came within two and a half feet of the eastern rail of the south bound track, which the testimony shows was the line of overhang of the engine, and hence the zone of danger from it (a distance of forty feet), the failure of the plaintiff to notice the alarm of the whistling through the teeth, or the noise of the moving engine, and the continuous looking of the plaintiff toward the north as he moved, with his face turned practically entirely away from the approaching engine, obviously absorbed in looking for any train which might be coming from that direction, and obviously unconscious of the noise of the engine and the whistling of the lookout man, and also obviously intending to continue on crossing the south bound track, unless some louder warning were given him, was all in plain view of the lookout man aforesaid.    And there is no evidence that any duty of the latter engaged his attention at the time, other than that of keeping a lookout and signalling to the engineman and fireman if a man was on or apparently was about to go on the track.    The evidence further shows specifically that when the plain-

tiff had come within the danger zone aforesaid and was walking on, and it became certain that he would be struck unless some louder warning was given him so that he might step back out of the zone of danger, the engine was still at least 184 feet away from him. The irresistible inference of fact which must be drawn from the above mentioned circumstances shown in evidence is that the lookout man saw the plaintiff at the time, and that the plaintiff was obviously in peril before he actually crossed the danger zone line, when he was a few steps therefrom, and that the engine was then amply far enough away for a tap of the bell or a sound of the whistle to have been given and for the engine to have been then stopped or, at the least, its speed slackened before it reached the plaintiff. And yet, the lookout man gave no warning to the engineman or fireman of the perilous position of the plaintiff, no bell was rung, or attempted to be rung, nor whistle blown, or attempted to be blown, the engine was not then stopped, nor attempted to be stopped, its speed was not slackened, nor attempted to be slackened; only the obviously unheard whistling through the teeth continued as the sole warning given the plaintiff until he was run down by the engine and injured as aforesaid.

*Robert B. Tunstall* and *Perkins, Walker & Battle*, for the plaintiff in error.

*Fife & Pitts* and *F. C. Moon*, for the defendant in error.

Sims, J., after making the foregoing statement, delivered the following opinion of the court:

[1, 2] In the view we take of the case the defendant was guilty of primary negligence in running the engine

at a speed in excess of the lawful speed limit, and in failing to ring the bell as the engine approached the crossing, as required by the ordinances of the city; and the plaintiff was guilty of negligence in failing to observe the approach of the engine before he went upon the track where he was struck and injured. That leaves for our sole consideration the following question:

1. Is the last clear chance doctrine applicable to the case?

This question must be answered in the affirmative.

[3, 4] This case is ruled by the holding and principle laid down in *Gunter* v. *So. Ry. Co.*, 126 Va. 565, on page 595, 101 S. E. 885, on page 894. The following is there said, on page 595: " * * *whatever may have been the prior holdings*, we are of opinion that when the engineman or other person in charge of a moving engine or car sees a person in apparent possession of his faculties on the track, *or so near thereto*, that he will probably be injured or killed unless he changes his position, he has the right to assume that he will change his position in time for his own safety *until the approach is so close that an engineman of ordinary care and prudence would be admonished of his peril, and if he then gives no evidence of consciousness of his peril it is the duty of such engineman or person in charge to give timely and suitable warning of the approach of such engine or car, and if the warning appears to be unheeded to use all other means within his power, consistent with his highest duty to other persons, to avoid injury to one who has thus exposed himself. The failure to exercise this degree of care is negligence for which the master is liable.*" (Italics supplied.)

Indeed the instant case is stronger for the plaintiff than the *Gurier Case*, in that in the present case there was the obvious failure to notice the signal of the whistling of the lookout man through his teeth, as a super-

added fact showing the obvious unconsciousness of the plaintiff of his peril, in addition to the other super-added facts, stated above, showing such unconsciousness. And we are of opinion that upon the facts of the instant case, before it was absolutely certain that the plaintiff would be struck, when the plaintiff was yet a few steps away from the danger zone—*i. e.*, from the line of the overhang of the engine—it was obvious to the lookout man on the engine that the plaintiff had not heard the noise of the engine or of the whistling through the teeth signal, and that the engine was then so close that the lookout man, if he had exercised ordinary care and prudence, would have been admonished that the plaintiff was, under the circumstances, obviously in grave peril; that thereupon, the plaintiff having given no evidence of consciousness of his peril, it was the plain duty of the lookout man to have notified the engineman of such peril, so that a louder alarm, by whistle blast or tap of the bell, might have been given, and if that had been unheeded, that the engine might have been stopped or its speed slackened; that the engine was then amply far enough away for all of these things to have been done by the exercise of reasonable diligence; and that the engine was moving so slowly that if any of them had been done the preponderance of the evidence is that the plaintiff would not have been injured.

We are therefore of opinion that the case must be affirmed.

*Affirmed.*

REHEARD NOVEMBER 16, 1922.

KELLY, P., delivered the opinion of the court.

[5] This case is before us upon a rehearing. The former opinion, reported in 109 S. E. 482, states the

facts fully and correctly, with the exception of the inadvertent reference therein to the length of the engine as being 184 feet. The fact is that it was only eighty-four feet long. This error, however, was immaterial, and does not affect the result. While it appeared from the statement of facts in the opinion that after the plaintiff had entered what is referred to as the zone of danger, the engine was still about its own length away from him, a correct interpretation of the opinion shows that the decision was not rested upon the theory that there was time enough for the employees of the defendant company to avert the accident after the plaintiff had actually crossed the danger line. It may be conceded, and it is probably true, that if the case depended upon that theory there could be no recovery because the intervening time and distance would not have been sufficient to warrant the application of the doctrine of the last clear chance.

We held before, and hold now, that the lower court was right in overruling the demurrer to the evidence because if the case had gone to the jury they would have been warranted in finding (1) that before the plaintiff had reached a point which brought him within the overhang of the engine, it ought to have been apparent to the look-out man that the plaintiff was unconscious of its approach and that a collision, if not inevitable, was highly probable, unless some more effective signal was given, or unless the speed of the engine was reduced; (2) that when this situation developed there was still ample time and opportunity to give such signals, to reduce the speed, and, if necessary, to stop the engine; and (3) that no effort was made to do either of these things.

[6] The issues of law and fact arising between the former opinion and the contention of the defendant on this rehearing are narrow and sharply drawn. The

real gravamen of the defendant's argument is (1) that the plaintiff was not actually in a position of danger until he came within the overhang of the engine, and (2) that until he reached that point the lookout man not only did not know that he would not stop in time to save himself, but was justified in presuming that he would remain in a place of safety. As to the first branch of this contention it seems sufficient to say that a man who is obviously walking heedlessly from safety into immediate danger is in imminent peril. As to the second branch, there was, of course, a sense in which the lookout man did not know that the plaintiff would fail to stop, because it was entirely possible for him to stop at any moment. But exactly the same thing would have been true, and exactly the same principle would have applied, if he had been walking or standing in the middle of the track with his back to the engine. In that situation the operatives would have had the right to presume that he would look out for or hear the train and provide for his own safety, unless and until they got so close as to make it apparent that he probably would not change his position. In this latter event—that is, when it became apparent that he probably would not get off of the track—it would still be impossible for the men in charge of the train to know absolutely that he would not yet take the one or two steps necessary to save himself, but they would no longer have the right to act upon the presumption that he would get out of the way. This is exactly the principle which was applied in the case of *Gunter* v. *Southern R. Co.*, 126 Va. p. 565, 101 S. E. 885, cited in the former opinion, and likewise applied in *N. & W. R. Co.* v. *Arrington*, 131 Va. 564, 109 S. E. 303.

[7] Undoubtedly, the general rule is that when those in charge of a train or engine see a traveler approaching a crossing in apparent possession of his faculties, and

situated so he can see the engine, they may presume
that he will stop before he places himself in a position
to be injured. But there is no particular magic in this
rule and it possesses no novelty. It is merely an in-
stance or an application of the more comprehensive pre-
sumption that every person will exercise ordinary care
for his own safety. The presumption ceases when the
obvious facts or circumstances are to the contrary. The
employees of a railway company running a train have no
right to presume that a traveler will stop before he en-
ters the zone of danger when his obvious position and
conduct are such as to indicate that he will not stop.
The decision in this case does not, as the learned coun-
sel for defendant seem to think, mark either a revolu-
tion or an advance in the law upon the doctrine of the
last clear chance as applied to railroad crossings. The
decision merely follows the law in this respect as it has
long been recognized in this State and elsewhere gener-
ally.

In *Southern R. Co.* v. *Daves,* 108 Va. 378, 61 S. E. 748,
relied upon by the defendant, this court said: "In
other words the railroad company cannot be held liable
for the failure of its engineer to anticipate that a person,
whether infant or adult, approaching a crossing, is going
to step upon the track immediately in front of a moving
engine, *unless there is something to suggest to the engineer
that such person does not intend to remain in a place of
safety until the train has passed.*" (Italics added.)

In *Morton* v. *Southern R. Co.,* 112 Va. 398, 71 S. E.
561, also relied upon by the defendant, liability was de-
nied "because there was no evidence tending to show
that there was something in the appearance of the de-
ceased to suggest to the engineer that he did not intend
to remain in a place of safety until the train passed, or
would be unable to clear the track until after he had

stepped over its west rail, before the engine reached the crossing."

In *Southern R. Co.* v. *Baptist*, 114 Va. 723, 77 S. E. 477, the court said: "It is well settled that where railroad employees discover persons near a railroad or approaching a crossing, such employees have the right to presume that the traveler will stop and not go upon the track immediately ahead of an approaching train, unless there is something to suggest that the traveler does not intend to remain in a place of safety until after the train has passed."

The cases of *Backus* v. *N. & A. T. Co.*, 112 Va. 292, 71 S. E. 528; *Springs* v. *Va., etc., Co.*, 117 Va. 826, 86 S. E. 65, and *Canody* v. *N. & W. R. Co.*, 129 Va. 56, 105 S. E. 585, are also cited in this connection by counsel for the defendant. The first two of these cases expressly recognize the exception to the general rule which controls the present case, and while the third contains no express reference thereto, there is nothing in the case to indicate that the conduct of the traveler as he approached the crossing was such as to charge the employees of the defendant with knowledge that he would probably not stop before he reached the crossing.

In 8 Thompson on Negligence (White's Supplement 1914), section 1601, it is said: "As a general rule train operatives have a right to assume that a person is in possession of his faculties and will retain a place of safety and will not recklessly expose himself to danger. The operatives are not bound to assume that he will heedlessly leave a place of safety and put himself on the track and in danger. But the operatives may not rely on this presumption if the circumstances are such as to indicate that the traveler is not aware of the approaching train."

In 33 Cyc. 981, the statement in the text is as follows:

"Except where there is a statutory provision to the contrary, an engineer or other employee in charge of a train ordinarily has the right to presume that a person on approaching a crossing is in possession of his natural faculties, and will take the precautions which the law requires him to take to insure his own safety, and that he is aware of the situation and will move to or remain in a place of safety; and the engineer or other employee seeing such person is generally under no obligation to stop or check the train,   *   *   *  .    Where, however, such railroad employee knows or has reason to apprehend that a person on or approaching the crossing is not in possession of ordinary ability to care for himself, * * * , or that by reason of other circumstances he apparently will not get or stay out of danger, it is his duty to use all reasonable efforts to slacken the speed of the train, and if possible to stop it in time to avert the accident; and if he fails to do so, the railroad company is liable for the resulting damages."

[8] Citation of authorities to the foregoing effect might be multiplied indefinitely.    The reason of the thing, as well as the uniform course of authority, leads irresistibly to the conclusion that the doctrine of the last clear chance applies just as well when it is apparent that a person is on the verge of stepping heedlessly into danger as when it appears that he is likely not to change his position so as to get out of danger.    The doctrine is founded in humane considerations, and there is no reason for making a distinction between cases of the former and latter type.

[9] If there be inquiry as to just when the presumption that a traveler on or approaching a railroad track will use due care, ceases to operate as an excuse for a failure on the part of trainmen to take active steps for his protection, the answer is that no inflexible rule can

be laid down.   Every case must be decided upon its own facts.   To the ordinary and usual situation of a traveler on or approaching the track, there must be superadded circumstances sufficient to charge an ordinarily prudent man with a sense of danger.   As said in the *Gunter Case, supra,* "it matters not how an engineman is admonished of the peril," and "if the evidence leaves it doubtful   *   *   *   the question is one for the jury."

The conclusion of law upon the demurrer to the evidence could not be different from that which we reached on the former hearing without violating settled principles, and we adhere to that conclusion.

*Affirmed.*

BURKS, J., dissenting.