# Richmond

CHESAPEAKE & OHIO RAILWAY COMPANY v. VINCENT O.
JACOBS, ADMINISTRATOR OF MARY CATHERINE
ENNIS, DECEASED.

January 16, 1936.*

Present, Campbell, C. J., and Holt, Hudgins, Gregory and
Eggleston, JJ.

*Rehearing denied March 12, 1936.

The opinion states the case.

*Barbour, Garnett & Pickett,* for the plaintiff in error.

*Robert E. Scott, Burnett Miller* and *C. W. Carter,* for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

The writ of error brings under review the proceedings in the trial of an action instituted to recover damages for the wrongful death of Mary Catherine Ennis, an infant fourteen years of age, killed by C. & O. passenger train No. 5, on the grade crossing at Calverton, Fauquier county. The trial court entered judgment for $3,000 on the verdict of the jury.

On June 21, 1932, about 3:30 P. M., Mary Ennis and her three-year-old niece were passengers in a Chevrolet coupe, operated by her sister-in-law, Mrs. Norma Ennis, traveling eastwardly along the highway at Calverton, over a grade crossing, where the automobile was struck by the C. & O. southbound passenger train. On this crossing there are five sets of rails; two main line tracks, one for northbound, and one for southbound trains; a side, and spur tracks lie to the east of the northbound tracks. The highway crosses these four sets of rails at approximately right angles. The fifth set of rails lie to the west

of the southbound main line tracks and lead to Warrenton. The distance along the center of the highway, from the center of the Warrenton track to the center of the southbound main line track, is approximately thirty feet. The view of the eastbound traveler on the highway, to the north, as he approaches the crossing, is obstructed by the post office building and a hedge, forty feet from, and running parallel with, the tracks for southbound trains. Forty-seven feet from the center of the southbound rails, such traveler can see a train approaching from the north when it is 200 feet from the crossing; at a point forty-four feet from the center he can see a train so approaching 250 feet; after he passes over the Warrenton track he can see a train approaching for more than 1,500 feet; the nearer the traveler gets to the crossing the farther north he can see. The Shumate woods, hereinafter referred to, are some 2,000 feet, the whistle board is 1,519 feet and the tool house is 510 feet, from the center of the crossing.

The Chevrolet coupe, of which Mary Ennis was an occupant, approached the crossing from the west traveling about as fast as a man can walk, estimated to be about five miles per hour. It passed over the rails leading to Warrenton, but after getting on the rails for southbound trains, the car momentarily stopped, was struck by the engine, and the three occupants of the car were killed.

Defendant moved the court to strike out plaintiff's evidence, and after verdict moved to set it aside on the ground that the evidence was not sufficient to prove the statutory crossing signals were not sounded, or that defendant had the last clear chance to avoid the collision. The refusal of the trial court to sustain either of these motions constitutes the first assignment of error.

Plaintiff relies upon the testimony of six witnesses called by him, and one called by defendant, to prove the requisite crossing signals were not given. Three of plaintiff's witnesses testified that at least two short sharp blasts were sounded just before the impact. One, Mrs. Everett M. Smith, testified that she saw the train from an upstairs

window; that the only signal she heard was a short blow after the train emerged from the woods, and another short blow at the tool house; and that the train and the automobile on the crossing were in plain view. John A. McConchie said that he was walking about fifty yards from the crossing, and heard a sharp blast of the whistle, but was unable to say whether or not there were additional blows. A third witness, Elmer Tyler, stated that he heard no signals except two "toots" of the whistle, which he recognized as danger signals, and these were followed immediately by the impact.

Stuart Eustis stated that he was seventy feet from the crossing, and he heard one long blast and several short ones just before the impact, and that no appreciable time elapsed between the long blast, and the short ones.

Arnold Grinnan stated that he was approaching the crossing on a truck loaded with cord-wood; that he saw the train as it emerged from the woods; that he did not watch it, and heard no signal of any kind, but that he was not paying attention, and couldn't say whether he would have heard the crossing signals had they been sounded. The defendant introduced W. W. Johnson as a witness, who stated that he was a conductor on another C. & O. train, which was delayed near the crossing because of engine trouble; that he was in the waiting room to be near the telegraph office in case he received orders by wire; that he happened to think it was time for this passenger train, glanced at his watch, looked out of the window and saw the collision, but prior to the crash he heard no signals.

Hugh Beach testified that he was driving a 1928 model Whippet car with his wife, his mother-in-law, and several small children as passengers; that he was looking for blackberries and was not following any road at all, but was going across a field approximately one-fourth of a mile from the right of way; that he saw the train as it emerged from the woods, watched it until it passed the tool house; and that he heard no signals at all.

The positive statements of at least four witnesses for plaintiff clearly establish the fact that as the train approached the crossing, signals of some kind were given by those in charge of the engine. There is some confusion or discrepancy between these witnesses as to the number of blasts sounded. Two state that they heard two distinct blows. One stated that he heard a long blast, followed by several short sharp blasts. Whatever number of blows may have been given, witnesses for the plaintiff recognize the fact that the last blows of the whistle immediately before the impact, were intended to be danger, or distress signals.

Bearing in mind the uncertainty of the type of signals which were sounded, according to plaintiff's evidence, we turn to the testimony of the eight witnesses introduced by defendant on this issue. This testimony shows that there were three men, the engineer, the regular fireman, and a traveling fireman, on the engine pulling the passenger train. Each of these testified that after the engineer sounded the blow for the station, he gave six blasts of the whistle, two blasts, then an intermission, two more blasts and an intermission, one short blast followed by a long blast, which continued until the engineer saw the automobile was attempting to cross the tracks, then he sounded two short sharp blasts of the whistle. The regular fireman turned on the automatic switch, which started the bell ringing and kept it ringing until it was turned off after the impact.

Three other witnesses, Lane, Roberts and Wilkerson were working on another C. & O. engine which was standing on the side track some 1,200 feet north of the crossing, they saw passenger train No. 5 before it emerged from the woods, stopped work on their engine and watched it pass within thirty feet of them. Each testified that the crossing blows were being given and the bell was ringing as it passed them. They stated that they noticed this particularly, and that the fact was impressed upon them because it was the first time that they had heard these par-

ticular crossing signals given by a C. & O. train. It seems that at this particular point the right of way is owned by the Southern Railway, and that this road had just adopted the six blasts of the whistle as the new crossing signals which the C. & O. engines were required to give when operating on the Southern Railway tracks.

The conductor and the flagman, on the train involved in the accident, testified that they heard the whistle as the grade crossing blows were sounded, but that they did not hear the bell ringing. The flagman was inside the ninth or last coach, and the conductor was on the diner, which was the eighth car from the engine. From their positions each stated it was difficult, or impossible to hear the sound of the bell above the roar of the running train.

The evidence for plaintiff, as heretofore recited, is negative, the evidence for defendant is affirmative and positive.

In passing upon this character of testimony certain general rules control. Judge Riely in *Southern Railway Co.* v. *Bryant's Adm'r,* 95 Va. 212, 215, 28 S. E. 183, said: "It is consonant with reason and human experience that the positive testimony of a single witness, whose credibility is unimpeached, that he saw or heard a particular thing at a particular time and place, ought ordinarily to outweigh that of a number of equally credible witnesses, who, with the same opportunities, testify that they did not see nor hear it. The particular thing might have taken place, and yet from inattention they may not have seen, nor heard it, or, though conscious of seeing or hearing it at the moment of its occurrence, may have afterwards forgotten it from lapse of time or defective memory. In such case, the evidence of the one witness is positive, while that of the many is merely negative. But where a witness, who denies a fact in question, had as good opportunity to see or hear it as he who affirms it, and his attention, because of special circumstances, was equally drawn to the matter controverted, the general rule that the witness who affirms a fact is to be believed rather than he

who denies it does not hold good. The denial of the one in such case constitutes positive evidence as well as the affirmance of the other, and produces a conflict of testimony."

This court has applied these general rules in numerous cases. They were discussed at length in *White* v. *Southern Railway Co.*, 151 Va. 302, 314, 144 S. E. 424, 427. In that case Judge Prentis, after reviewing a number of decisions, from this and other jurisdictions, said: "The statement of a witness that he did not hear such a signal is without value as evidence, unless it further appears that he was in a position to hear, was attentive, and that the conditions were such that he would probably have heard such signal if it had been sounded."

The evidence for the plaintiff must be tested by these principles. The testimony of W. W. Johnson and Arnold Grinnan is wholly negative. Each frankly stated that he was not paying any attention to the approaching train and did not hear any signals. John McConchie said that he was not paying any attention to the train until he heard a very short sharp blast of the whistle, which attracted his attention. When asked if he heard any other blows, he stated: "Well, I did not, but of course I did not pay much attention to the train. I live right beside a railroad track; I do not pay much attention to the trains, but I did pay attention to the steam blow." * * *

"Q. Did you hear any ringing?

"A. I cannot say. Someone asked me that day, but I could not say whether the bell rang or not. I did not pay any attention to the bell."

Stuart Eustis stated that he heard a long blast and several short ones. Then he was asked if he would have heard other signals if they had been sounded, and he replied, "I think so." On cross-examination he was asked:

"Q. And before that time you had not been paying any particular attention, one way or another, until your attention was attracted that way?

"A. No.

"Q. And that was the very first thing you heard?

"A. Yes.

Elmer Tyler was back of Spicer's Garage, 100 yards from the crossing, screwing the end of a hose to a spigot for the purpose of washing a car. He was not paying any attention to passing trains. The first thing which drew his attention from his work was the two sharp blasts of the whistle immediately followed by the impact. Notwithstanding the fact that his attention was concentrated upon his duties at the garage, he stated that he could have heard other signals had they been given. His opportunity for hearing the signals, and the fact that his attention was concentrated elsewhere detracts from the probative value of his testimony.

Mrs. Smith states that the first thing that drew her attention to the crossing, or the train, was the fact that as she looked out of the window, she saw the car standing on the crossing, and the train approaching. She doesn't attempt to estimate the distance the train was from the crossing, except to say that it was back of, or about the tool house, at the time it sounded its last blast. She was positive that she heard two blasts of the whistle. This is in accord with other evidence for both plaintiff and defendant. When she was asked would she have heard the signals had they been given, she replied that "It looked like I should have (I was) right there." She repeated the identical answer when asked if she could have heard the bell ringing. These statements are not positive evidence, and convey the impression that the witness herself had some doubt about the matter.

The only other evidence for plaintiff on the question, is the testimony of Hugh Beach. This witness stated that the train was in his view, while it was running from the woods to the tool house. During that time he was driving across a field in a four-year-old car, and while crossing this field, he shifted gears. Under these circumstances the probabilities are that Beach was not paying much attention to a train passing a quarter of a mile away.

In addition, four witnesses for plaintiff, and eight for defendant, state positively that the whistle was sounded at least twice before it passed the tool house. Beach's testimony is that he did not hear any signals. When asked if he could or would have heard signals had they been sounded, he replied, "I think so, I always hear them." This statement, like the statement of Mrs. Smith, is not positive. Considering all the evidence for plaintiff, the best that can be said for it is, that there was a scintilla of positive evidence, but not enough to support a finding by the jury, that the requisite crossing signals were not sounded.

In dealing with similar evidence, Judge Prentis, in *White* v. *Southern Railway Co., supra,* 151 Va. 302, at page 319, 144 S. E. 424, 429, said: "It seems to us then that unless we are to treat the definitions of negative testimony as a mere form of words signifying nothing, and to disregard the established rule as to the worthlessness of negative testimony, we must hold that there is no evidence in this case to support the verdict for the plaintiff. * * * Substantial conflicts in testimony must be submitted to a jury, but where there is no real conflict, juries should decide questions of fact in accordance with the testimony submitted. The plaintiff has clearly failed to show by a preponderance of the evidence that defendant's servants failed to sound the requisite statutory signals, whereas the defendant has shown without substantial contradiction that these signals were given. There is no evidence to support the verdict and it is against the evidence."

Plaintiff contends that the case is controlled by *Southern Railway Co.* v. *Whetzel,* 159 Va. 796, 167 S. E. 427; *Virginian Railway Co.* v. *Haley,* 156 Va. 350, 157 S. E. 776. In the former case the opinion distinctly states that at least three witnesses gave positive testimony that the requisite signals were not sounded. These witnesses were standing on a hill, looking down on the train as it crossed a trestle and continued toward the crossing for a distance of 1,900 feet. They were in a position to see and hear,

and their attention was directed to the particular train as it passed in front of them. In the *Haley Case,* Judge Epes quoted at length from the testimony of several witnesses which clearly demonstrates that their testimony was positive and not negative. For an analysis of evidence strikingly similar to evidence for plaintiff, in this case, see *Johnson* v. *R., F. & P. Railway Co.,* 160 Va. 766, 169 S. E. 603; *Norfolk & Western Railway Co.* v. *Eley,* 157 Va. 568, 162 S. E. 3, and cases therein cited.

The next question presented is whether there was sufficient evidence in the record to support an instruction on the failure of the defendant to stop the train before it reached the crossing, after the crew in charge of the engine discovered, or ought to have discovered the peril of the occupants of the Chevrolet coupe on the crossing.

Agents of defendant had the right to assume, until the contrary appeared, that the operator of the coupe would exercise ordinary care for her own safety, and the safety of the other occupants of the car; that she would not attempt to negotiate the crossing in front of an approaching train, or if she had time to cross the track in safety, she would not stall, or so operate her car as to stop it on the tracks at a place of certain death. Hence there was no duty upon defendant to take active steps to stop the train until it discovered, or in the exercise of due care should have discovered, that the occupants of the coupe were in a position of peril.

We turn to the evidence to ascertain whether the doctrine of the last clear chance should be applied in this case. Mrs. Smith said that the first thing she saw was the automobile standing on the tracks. She does not state how near the engine was at that moment. John A. McConchie stated that he heard a sharp blast "and I turned my head and happened to see the car standing on the tracks and I turned around and in a few seconds I started to run straight towards the car and the crash came." This is all of the pertinent evidence for plaintiff on this issue. It

falls far short of being sufficient to submit the question to the jury.

This evidence for plaintiff does not contradict, in the slightest degree, the evidence for defendant. Several witnesses called by defendant testified on the point. Oliver, the engineer on the passenger train, stated that after giving the crossing blows, he was sounding a continuous blast of the whistle, and when the engine was 300 or 350 yards from the crossing he saw the coupe was not going to stop, he then changed the long blast to two short blows to cause the driver of the automobile to speed up, "it was going a little bit slow;" that the driver had ample time to clear the tracks in safety if the car had kept moving at the same speed as it was going; that after the automobile had gotten on the crossing, his view of it was cut off by the front of the engine. When he was about 100 yards from the crossing, the fireman called, 'hold them;' that instantly upon receiving this signal he fixed his brakes in emergency which brought the train to a full stop with the eighth car standing on the crossing.

R. E. Davis, the regular fireman, stated that he was seated on the left side of the engine and that as the Chevrolet coupe came on the crossing in his line of vision, it was moving slowly; that it stopped on the tracks; that as soon as he saw this he gave the signal to the engineer to apply his emergency brakes, which was done immediately. This witness, like the engineer, said that if the automobile had kept running as it was when he first saw it, it would have cleared the tracks and there would have been no collision.

All of the witnesses testifying on the subject said that Calverton was a flag stop; that when the train emerged from the woods it was traveling about fifty miles per hour; that the engineer reduced the speed for the purpose of making a smooth stop at the station if the signal were given so to do, but that no signals were given, and that the speed of the train at the time the emergency brakes were applied was thirty to thirty-five miles per

hour, and that considering the length and size of the train it was a quick emergency stop.

The testimony of the engineer, on the subject, is as follows:

"Q. Why did you give the warning or danger signal?

"A. I saw this car; giving notice to step on it a little bit. It was a little bit slow.

\* \* \* \* \* \* \* \* \* \*

"Q. (interposing) Where was the automobile when you first saw it?

"A. Well, between the two tracks there; that Warrenton track and our main line southbound main line. (The distance between the two tracks, from center to center, is thirty feet.)

\* \* \* \* \* \* \* \* \* \*

By Mr. McCandlish:

"Q. Well, at the time you saw it coming up to that track on which you were, did the automobile or not have ample time to cross if it kept on going?

"A. Oh, yes; yes, sir.

\* \* \* \* \* \* \* \* \* \*

"Q. How did that happen? How did it get out of your sight?

"A. Because it was moving all the time, you see; it had never stopped in my vision.

\* \* \* \* \* \* \* \* \* \*

"Q. Was it going fast or slow?

"A. No, going medium; about as fast as you could walk; about that fast.

\* \* \* \* \* \* \* \* \* \*

"Q. How did you learn it had not gotten across?

"A. A signal from my fireman, hollering 'Hold them.'

"Q. What did you then do?

"A. Fixed my brakes in emergency.

\* \* \* \* \* \* \* \* \* \*

"Q. Well, at the time the fireman gave the signal to 'Hold them,' what were you doing?

"A. I was blowing the whistle.

"Q. Then, what did you do?

"A. Let go of the whistle and slapped my brakes in emergency."

This witness was not so clear on his cross-examination, but there is nothing in the record to contradict the above statements.

Plaintiff, in effect, contends that it was the duty of defendant to apply his emergency brakes and stop the train before reaching the crossing, because an automobile in the control of an unskilful driver might become stalled on the tracks and the defendant should have been cognizant of this fact. In support of this contention he cites *Chesapeake Ferry Co.* v. *Cummings,* 158 Va. 33, 164 S. E. 281, 82 A. L. R. 790. In that case we were discussing the duty a common carrier owes to its passengers. In the instant case we are dealing with the duty a railway company owes to travelers on the highway at a grade crossing, which is ordinary care. This duty is discussed at length in a number of Virginia cases, among them *Southern Railway Co.* v. *Daves,* 108 Va. 378, 385, 61 S. E. 748, 749. Here the court said: "In other words, the railroad company cannot be held liable for the failure of its engineer to anticipate that a person, whether infant or adult, approaching a crossing, is going to step upon the track immediately in front of a moving engine, unless there is something to suggest to the engineer that such person does not intend to remain in a place of safety until the train has passed."

Judge Kelly in *Director General* v. *Blue,* 134 Va. 366, at page 379, 109 S. E. 482, 114 S. E. 557, 558, after reviewing a number of decisions on the point, at page 379 said: "If there be inquiry as to just when the presumption that a traveler on or approaching a railroad track will use due care, ceases to operate as an excuse for a failure on the part of trainmen to take active steps for his protection, the answer is that no inflexible rule can be laid down. Every case must be decided upon its own facts. To the ordinary and usual situation of a traveler on or approaching the track, there must be superadded circumstances

sufficient to charge an ordinarily prudent man with a sense of danger."

Plaintiff also relies upon *Chesapeake & Ohio Railway Co.* v. *J. P. Gayle,* 132 Va. 433, 437, 112 S. E. 785, 786, where Judge Prentis, speaking for the court, said: "* * * if the engineman did see the approaching automobile, it was at least his duty to take note of it, and if it appeared that the driver of the machine was unconscious of his peril, to reduce the speed of the train and bring it under control if possible."

Here the engineer did take note of the approaching automobile, and when at a distance of 300 to 350 yards, he saw the automobile moving slowly toward the track in apparent control, but as it was not going to stop, he concluded the driver had time to pass over the crossing in safety. He gave the distress signal in order to warn the driver that they had no time to spare, and to hasten over the crossing. There is no one to tell us whether the occupants of the car were aware of the approaching trains, as all were killed as a result of the unfortunate accident. Those in a position to know the facts, tell us that the automobile would have passed over the crossing in safety if it had not stopped. Under these circumstances it cannot be said that the engineer was guilty of negligence in not applying his emergency brakes at the point where he first sounded additional warning signals.

As said by Judge Prentis in *Washington & O. D. Railway* v. *Thompson,* 136 Va. 597, 603, 118 S. E. 76, 78, "It should and must be emphasized that a plaintiff is not entitled to recover under this doctrine upon a mere peradventure. He has no right to hold the defendant liable merely upon showing that perhaps, if the defendant's agents had responded properly, promptly, instantaneously, he might have been saved. The burden is upon him to show affirmatively by a preponderance of the evidence which convinces the average mind that by the use of ordinary care, after his peril was discovered, there was

in fact a clear chance to save him. It is insufficient to show that there was a mere possibility of so doing."

In this case the positive evidence is that the defendant gave the statutory signals, and that at the time the engineer saw the automobile approaching the tracks, the occupants of the car had ample time in which to stop, or to continue across the tracks in safety. The engineer, as an additional warning, sounded danger signals. The car then passed out of his sight. When it came into the view of the fireman, sitting in the cab on the left side of the engine, it was still moving, and if it had continued to so move, it would have passed over the crossing in safety, but for some unknown reason the automobile stopped, and as soon as the fireman saw this he gave the signal for an emergency stop. The engineer, upon this signal, instantly applied the emergency brakes and brought the train to a quick stop, consistent with the safety of the passengers on the train. There is no substantial contradiction of these facts, hence the plaintiff has failed to establish any negligence on the part of the railway company.

For the reason stated, the judgment of the trial court is reversed, the verdict of the jury is set aside, and final judgment here entered for the defendant company.

*Reversed and final judgment.*