# Richmond

## SOUTHERN RAILWAY COMPANY V. MARY V. BERRY, EXECUTRIX.

February 20, 1939.

Record No. 2030.

Present, Campbell, C. J., and Holt, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*Thomas B. Gay, James H. Corbitt* and *Wirt P. Marks, Jr.,* for the plaintiff in error.

*Irby Turnbull* and *Perry A. Ozlin,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

Under review is a crossing accident in which plaintiff's decedent was killed. Her contention is that the defendant was negligent in that it failed to give the statutory crossing signals of approach, and that this failure was a proximate

cause of her husband's death. She has recovered a verdict and judgment.

The conditions at this crossing are shown by a survey and blueprint. The railroad runs substantially north and south, with a two-degree curve to the right going north. The highway runs east and west and is an ordinary county dirt road.

This crossing, known in the record as the Mission Crossing, was about a half mile north of Chase City. The whistle post to the south is 1,818 feet away and the box factory about 600 feet. Robert Roberts' house is 634 feet distant and to the south; it is 218 feet west of the railroad track.

The defendant's passenger train was going north. F. D. Berry, the decedent, in an automobile was driving east. Of course the defendant was familiar with conditions at this crossing and Berry was also; for many years he had been a rural free delivery mail carrier.

From a point 1,800 feet south of the crossing to a point about 100 feet from it, the railroad is on an upgrade. From this last named point, it runs through two cuts. To the west of the railroad and to the south of the highway, the elevation of the ground increases, and in the angle made with the county road is an area of about an acre, on which are 58 trees. None of them are on the right of way, but their limbs hang low, and there is also underbrush which obstructs the view of the railroad as one approaches it from the west. There are no obstructions within fifty feet of the crossing. Forty feet from the crossing, as one approaches from the west, an approaching train could be seen for 1,200 feet. This view is somewhat cut off by the curve. At the crossing itself, a train could be seen for 600 feet.

The accident occurred in the morning of May 23, 1937. The train was on schedule and was running from twenty-five to thirty-five miles an hour. When about two-thirds of a mile from the crossing, it appears that the automobile was traveling at a rate of from twenty-five to thirty miles an hour and, at the moment of impact, its speed was about that of the train. The only eyewitness to the accident was the fireman, who saw the automobile when it was 150 or 160

feet away. He said that when the car got within about forty feet of the railway track, he saw its driver bend over. The car appeared to increase its speed, was squarely struck in the collision which followed, and was carried some distance down the track before the train was brought to a standstill. The engineer's view was cut off by the boiler of the locomotive. When Berry was seen to bend forward and increase the speed of his car, the fireman called out to the engineer, but it was, of course, then too late.

An engineer who sees an automobile approaching a crossing has the right to assume that it will stop in time to avoid an accident, and he may act upon this assumption unless there is some superadded circumstance sufficient to charge an ordinarily prudent man with a sense of danger. *Director General* v. *Blue,* 134 Va. 366, 109 S. E. 482, 114 S. E. 557; *Chesapeake & O. Ry. Co.* v. *Jacobs,* 166 Va. 11, 183 S. E. 221. Unless the situation is one of imminent peril, ordinary care is all that is required of a railroad. *Norfolk & W. Ry. Co.* v. *Mace,* 151 Va. 458, 145 S. E. 362.

Trains have the right of way; otherwise no adequate schedule could be maintained, particularly in thickly settled communities where automobiles are almost always in sight.

One who sees a train approaching, when there is yet time for him to stop, and is injured in attempting to cross the track ahead of it can not recover for there would be no causal connection between the accident and the failure of the locomotive driver to sound his whistle. *Southern Ry. Co.* v. *Giles,* 169 Va. 218, 192 S. E. 772.

Causal connection between the failure to give the statutory signals and the injury must be shown and will not be presumed. Proof of failure to give these signals and proof of injury and nothing more are not enough. *Simons' Adm'r* v. *Southern Ry. Co.,* 96 Va. 152, 31 S. E. 7; *Virginian Railway Co.* v. *Haley,* 156 Va. 350, 157 S. E. 776. If the failure to give the statutory signal in any way contributes to the accident, the plaintiff is entitled to recover, however gross may have been his negligence; that negligence may mitigate the *quantum* of his recovery but can not prevent it.

*Norfolk & W. Ry. Co.* v. *Hardy,* 152 Va. 783, 148 S. E. 839; *Norfolk & W. Ry. Co.* v. *White,* 158 Va. 243, 163 S. E. 530.

The substance of it all is this: The plaintiff must prove his case as other plaintiffs must. He must show that the signals were not given, that he was injured and that there is some causal relation between these two facts. When he has done this, he is entitled to recover, and this no negligence of his can prevent, although, if shown, it may and should reduce the amount of that recovery to which he otherwise might have been entitled.

Before the plaintiff can recover, it must be made to appear that the whistle was not sounded at least twice at a distance not less than 300 yards nor more than 600 yards from the Mission Crossing; if it was, there can be no recovery. It is not contended that there was any failure to ring the bell. Code, section 3958.

These requirements are statutory and mandatory; there can be no substitute, although that substituted may be equally good. *Gregory* v. *Seaboard Air Line Railway Co.,* 142 Va. 750, 128 S. E. 272.

In its nature, evidence that a certain thing did not happen is often negative in form, although it may be positive in substance. Evidence of a witness who, in attention, stood by a locomotive at a certain time and place and who said that it did not then whistle, has all the weight that such a statement could have, independent of the phraseology used, while the evidence of a witness who for any reason was so placed that the waves of sound could not reach him is without value. Between these poles an indefinite number of situations may arise. Distance, the topography of the country, the wind, if any, its velocity and direction, the attention or inattention of the witness, the character of his occupation at the moment, his alertness to casual impressions, are among considerations which should be remembered. There is no yardstick by which to measure their value. When we have the verdict of a jury approved by a trial court, we can not override the positive evidence of one witness who has not been impeached which supports the

verdict unless it is inherently improbable, although he be contradicted by a number of others. That is not true when we come to weigh negative testimony which does not of itself rise to the dignity of a positive statement and this because of the considerations named. In the one instance he might afterwards be convicted of perjury; in the other he could not be, for always he might say "that was what I thought," or even "that is what I believed," for no one could contradict him. In any event, this evidence must be such that upon it a positive conclusion can be fairly reached —that is to say, it should warrant a jury in finding as a fact that the whistle did blow or that it did not blow. Since this case turns wholly upon evidence, its examination —dray horse and tedious—is necessary.

The plaintiff does not contend that the engineer did not blow for the crossing, but that the signals given were not those required by the statute in that they were not made at a distance of not less than 300 and not more than 600 yards from the crossing.

On this Sunday morning Robert Roberts, a colored man who testified for the plaintiff, sat on the porch of his home facing the crossing. In it he had lived for fourteen years. He remembered the occasion, heard the crash and saw the smoke from the train until it got within a quarter of a mile of his house, when the train itself came into view. He was asked if he knew where the whistle post down to the south of his home was and said that there was "one a little north of the box factory," to which counsel replied that was the one he had in mind. He saw the train as it reached that point and was asked if he heard it blow for the crossing, to which he answered: "Well, I heard it blow down the road before it got to that post, but I don't know whether it was on the south side or the north side," and did not hear it blow any more after that. He was watching the train and said that it was made up of two passenger cars and a tank car.

Otis Hepburn, a colored man and also a witness for the plaintiff, sat upon his porch on this occasion. He said that

his house was 150 yards from the crossing and from fifty to 100 yards from the railroad track and to its west, and that he saw the train when it came into sight about where the box mill was. "When I heard it blow it was opposite the box mill; at that crossing there just about the box mill. It was blowing for that crossing there" and did not blow any more. He was asked where the whistle post was and said: "There is another whistle post up the track about twenty-five or thirty yards up the track; it blowed for that post." He was asked if he knew where the whistle post for the Mission Crossing was; he said that he did and that it was "just about at my house; it is the one next to the last one before you get to the crossing." Again he said that it blew at the post below his house and at the one above his house.

Ben Parker, another witness for the plaintiff, was living with a Mr. McCall, whose home was about a half mile north of the crossing, and was then standing in the yard, paying no particular attention to the situation. He first heard the train just before it reached this crossing. He heard the crash and heard the train back up and stop; "it backed up and tooted its whistle twice right low. That was all the blowing I heard."

Since it is conceded that the whistle did blow before the accident, his evidence on that subject is without value.

Mrs. Ben Parker heard nothing except the sounding of the whistle after the accident. Her evidence is also entirely negative.

Mr. B. N. Bess, another witness for the plaintiff, lived seven-tenths of a mile from the crossing and on the road along which Berry came, who then appeared to be traveling from twenty-five to thirty miles an hour. He went down to the scene of the accident and testified as to the physical conditions there. On cross-examination he said: "I heard the whistle blow before I ever went out to the car but I didn't pay any attention to the whistle. I don't know what it was blowing for or where it was blowing." He was asked if he heard some short blasts and said that he did. He also said that "it was blowing after it left town all right—I

know that. It blew after it left town but I could not swear what crossing it was blowing for; I could not do that * * * I didn't pay very much attention to it. It blowed once or twice; I do not know which."

The final statement of this witness is that he was paying no attention but heard the whistle blow once or twice; he did not know when or where. Since those sounded after the accident were soft, they are probably not what he had in mind. He was recalled, and on further cross-examination he said that he knew all about the Mission Crossing, that there are two public crossings and that what he heard was a crossing blast. There seem to be two public crossings—one north of the Mission Crossing. There was a whistle post twenty-five or thirty yards north of the box factory, and he could not know for which of these crossings this signal was given; and if it was given for the Mission Crossing, he could not know where the engine then was.

Mary Shields, colored, lived between the Hepburn and the Roberts homes. She said that she knew where the whistle post was and saw the train as it passed near her house. She was in her kitchen and heard it blow down the road coming from Chase City and then came out of the kitchen, probably to watch it pass, but did not hear it blow any more. It thus appears that this witness, who lived between the Roberts and the Hepburn home, heard the whistle while she was still in the kitchen, went out and saw the train pass her house. She must have heard it before it passed.

R. S. McCall is the brother of Mrs. Berry. He lived in sight of the Mission Crossing, 300 or 400 yards away and to the west of it. He heard the whistle after the accident and was at that time milking in his barn just at an open door, although he was not paying any especial attention to the train. This was all that he heard.

Other witnesses for the plaintiff have testified that it blew before it reached the crossing, but McCall seems to have heard nothing until after the accident had occurred.

On this subject this is the plaintiff's case.

A. L. Huss was the defendant's first witness. He was standing in his yard 600 or 700 yards away, heard the crash and heard the engine blow, "two longs and two shorts; I believe that is a crossing blow." When asked where the train then was, he said: "Well, it was between the factory and the crossing. The factory is right much distant from the crossing. It was between the factory and the crossing." If this factory was 600 feet distant from the crossing, these signals came too late.

Martin Hoyle was the next witness. He was at Mr. Snipes' home, a quarter of a mile to the north of the crossing. Due to the curve, he could not see the train until it was from fifty to 100 yards from it. He said that this train first blew for the box factory crossing, which is a private and not a public crossing, when it was about 200 yards away, and that it blew again just before it came in sight at the Mission Crossing, which was from fifty to 100 yards distant.

J. D. Snipes was with Hoyle. He also heard the train blow twice, first "I thought, right at the box factory," and then it blew between the box factory and the crossing as it came around the curve. Again he said that it blew three times, the first being in the vicinity of the box factory.

Lewis Gregory, colored, was asked if he lived south of the box mill and said that he lived near the box mill and between it and the Mission Crossing. He said the train was blowing when it passed his house and made so much noise that he got up to see what was the matter, but it was then out of sight around the curve. Hudley's house is just above his; "it blowed between them two blow posts up there; it blowed up just before it got up to the two blow posts up there; it blowed just before it got to Hudley's and then it blowed up there higher, and it kept up so much fuss I got up to see what was the matter."

Charles Henry Pettus, colored, was the next witness. He lived on the south side of the county road west of the track, about 300 or 400 yards from the crossing. He heard the train blow for the crossing while he was taking a bath

—two longs and two shorts—but does not undertake to say where the train was then.

S. E. Wilmouth worked for the box factory and was standing on the corner of the lot near the railroad. He heard the train blow when it came around the corner and said that it blew three times when it got up to the whistle post, which was the whistle post next to the crossing, and that might have been when it was past the post. He heard six blasts. Again, he said it blew just as it came by the kiln house and blew three times again when it got to the whistle post, which was about a hundred yards from the factory.

Claude Owen lived and had lived in the west part of Chase City for twenty years. He left his home that morning and came up to a crossing by his home and stopped because of the approaching train, which blew for his crossing and passed. He said that after the train passed the box mill, it blew four times—two longs and two shorts. According to this witness, his crossing was 200 yards south of the box factory and a little more than that north of the Chase City railroad station. He further said that after the train had passed the box factory, it gave the station signals—two longs and two shorts. He said he saw the steam "from the exhaust of the whistle going right up the track."

In addition to these disinterested witnesses, the engineer, conductor, baggage man, flagman and fireman all say that proper crossing signals were given. As might be expected, there are discrepancies in their statements. Moreover, their personal interest in the results of this case, unless possibly the engineer be excepted, is remote. Their evidence is challenged because it is said that they could not possibly be expected to remember the incidents of a distant day, but this disastrous accident naturally served to impress them upon their minds.

The blueprint in evidence shows no crossing except the Mission Crossing, no whistle post, nor the box factory and its location.

Mr. Shugart, chief of police, said that the corporate limits were a half mile from the Mission Crossing and that the box factory is right near this crossing. On cross-examination he was asked:

"Q. How far is the box mill from the Thyne Institute?

"A. Oh, just a few hundred yards.

"Q. That is south of the Thyne Institute?

"A. Yes, sir.

"Q. Is that in the corporate limits?

"A. Just a part of it—very little."

This must mean that the lot on which the box factory is located touches the corporate limits for if it did not and if the Thyne Institute is south of it, that Institute would be within the city limits, when it is by the Thyne or Mission Crossing.

Mr. Owen, as we have seen, stopped at a crossing near his home which was in town. His estimate is that the box mill stood 200 yards to the north, from which it would appear that this mill stood about 700 yards from the crossing, maybe a little less.

Upon this evidence the plaintiff rests her case.

Roberts said that the whistle post was just north of the factory; he heard the whistle blow but could not say whether it was north or south of that point, and he did not hear it again. To support the accuracy of his observations, point is made of the fact that he observed the train and knew of its make-up. He said that it was made up of two coaches and a tank car. It was made up of two coaches and two tank cars.

Hepburn lived to the north of the box factory near it. He heard the whistle blow once below his house and once above it.

Mr. Bess, who lived seven-tenths of a mile from the crossing and to the west and who was at home upon this occasion, concluded his cross-examination thus:

"Q. Tell the jury what kind of blasts they were?

"A. Well, it was a crossing blast.

"Q. Could you tell them how many blasts were made, as best as you could hear?

"A. Well, they generally blow two long and two short.

"Q. Now, where did it seem to you at the time for what crossing those signals were given?

"A. Well, the train surely did blow for the crossing. There is no doubt but what it blew for the crossing.

"Q. This particular crossing?

"A. Yes, sir.

"Q. The Mission Crossing?

"A. Yes, sir."

"Mr. Corbitt: That is all."

"By Mr. Turnbull:

"Q. You don't know where it blew?

"A. No, sir, I don't know where it blew.

"Q. But you heard it blow?

"A. I heard it blow.

"Mr. Turnbull: That is all."

Mary Shields lived between the Hepburn and the Roberts homes. She was in her kitchen, heard the whistle blow down the road towards Chase City and came to her door to see the train pass but did not go out. She said that it did not blow after passing her house, and she rushed back into the kitchen and got her breakfast.

McCall lived 300 or 400 yards from the crossing on the dirt road. He was in his barn milking by an open door. He heard the train blow softly twice after the accident but did not hear it before then.

This is the evidence for the plaintiff relied upon to show that these signals were not given. Roberts heard the train blow once and no more; he could not tell whether that signal was given north or south of the whistle post. Hepburn, who lived north of the box factory, heard it blow twice, once before it passed his home and once afterwards, while Bess, seven-tenths of a mile away heard the crossing signal given.

As indicative of the attention or want of attention on the part of Roberts and Hepburn, it is to be noted that they did not hear the whistle blow after the accident, although

McCall, 300 or 400 yards away and in his cow barn milking, heard it.

For the defendant, twelve witnesses have testified to the effect that the signals were given, some interested and some disinterested. Attention is particularly directed to Owen, who is disinterested and who gives convincing reasons for his statements. He stopped at a crossing 200 yards above the box factory that this train might pass. He continued to watch it and heard not only the whistle but saw the escaping steam which made the sound.

In passing upon this character of testimony certain general rules control. Judge Riely in *Southern Railway Co.* v. *Bryant's Adm'r*, 95 Va. 212, 215, 28 S. E. 183, said:

"It is consonant with reason and human experience that the positive testimony of a single witness, whose credibility is unimpeached, that he saw or heard a particular thing at a particular time and place, ought ordinarily to outweigh that of a number of equally credible witnesses, who, with the same opportunities, testify that they did not see nor hear it. The particular thing might have taken place, and yet from inattention they may not have seen, nor heard it, or, though conscious of seeing or hearing it at the moment of its occurrence, may have afterwards forgotten it from lapse of time or defective memory. In such case, the evidence of one witness is positive, while that of the many is merely negative. But where a witness, who denies a fact in question, had as good opportunity to see or hear it as he who affirms it, and his attention, because of special circumstances, was equally drawn to the matter controverted, the general rule, that the witness who affirms a fact is to be believed rather than he who denies it, does not hold good. The denial of the one in such case constitutes positive evidence as well as the affirmance of the other, and produces a conflict of testimony."

In *White* v. *Southern Railway Co.*, 151 Va. 302, 144 S. E. 424, 427, Chief Justice Prentis said:

"The statement of a witness that he did not hear such a signal is without value as evidence, unless it further appears that he was in a position to hear, was attentive, and that the conditions were such that he would probably have heard such signal if it had been sounded."

And again:

"It seems to us then that unless we are to treat the definitions of negative testimony as a mere form of words signifying nothing, and to disregard the established rule as to the worthlessness of negative testimony, we must hold that there is no evidence in this case to support the verdict for the plaintiff. * * * Substantial conflicts in testimony must be submitted to a jury, but where there is no real conflict, juries should decide questions of fact in accordance with the testimony submitted. The plaintiff has clearly failed to show by a preponderance of the evidence that defendant's servants failed to sound the requisite statutory signals, whereas the defendant has shown without substantial contradiction that these signals were given. There is no evidence to support the verdict and it is against the evidence."

In *White's Case* a recovery was denied. A witness was asked if he could hear a whistle or a bell ring and answered: "Yes; I hear the bell very often in my home at times now. I could not help but hear it."

In the *Jacobs Case,* quite like that under review, there is a comprehensive examination of relative cases by Mr. Justice Hudgins. Witnesses were questioned as to whether they could have heard other signals than those given just at the moment of impact. One said, "I think so." Another stated that he could have heard other signals had they been given; a third said, "It looked like I should have (I was) right there." Another was gathering blackberries a quarter of a mile away. He watched the train and heard no signals at all. It is true that none of these witnesses had an occasion to pay any particular attention to what was going on. And that is also true in the instant case.

■ Unless we are to give but lip service to the limitations with which we have qualified negative evidence, we are forced to the conclusion that there is nothing to sustain the verdict under review. Plaintiff's witnesses do not agree among themselves. One of them has said, "the train surely did blow for the crossing. There is no doubt but what it blew for the crossing (the Mission Crossing)."

■ In reaching this conclusion, we have not felt it necessary to review the heavy weight of evidence which rests with the defendant, for if the plaintiff's evidence sustained the verdict, it should stand notwithstanding such a conflict.

We are not concerned with the extent of the view which this engine crew had of the approaching automobile. There was no superadded fact to bring to them the belief that the plaintiff in time would not slow up. When the absence of such a purpose did appear, it was then too late. When Mr. Berry put on speed, in an apparent attempt to cross ahead of the train, he made a collision inevitable. The train was but forty feet away, and nothing that the train crew could have done would have saved him.

It is manifest that the jury believed that contributory negligence had been shown, for we have a verdict of but $3,000 in a death case, although that alone would not defeat a recovery.

For the foregoing reasons, we are of opinion that the judgment of the trial court must be reversed, and it is so ordered.

*Reversed.*