# Richmond

UTILA GUTHRIE NICHOLS, ADMINISTRATRIX OF J. B.
NICHOLS, DECEASED v. SOUTHERN RAILWAY COMPANY.

January 12, 1948.

Record No. 3258.

Present, All the Justices.

The opinion states the case.

*Easley & Edmunds*, for the plaintiff in error.

*Thomas B. Gay, Don P. Bagwell* and *Lewis F. Powell, Jr.*, for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

On June 17, 1946, at about six a. m., J. B. Nichols, while driving several milk cows southwardly across the tracks of the Southern Railway Company, at a private crossing on his farm, was struck and killed by the engine of a westbound freight train operated by the Railway Company. In an action for wrongful death the decedent's administratrix recovered a verdict of $7,500 against the Railway Company which the trial court set aside and entered final judgment in favor of the Railway Company, on the ground that the evidence was insufficient to support a recovery. The matter is before us on a writ of error granted the administratrix.

Nichols, the decedent, lived on his farm in Halifax county, between South Boston and a flag station known as News Ferry. The tracks of the Railway Company run in an easterly and westerly direction through the Nichols' farm, separating the pasture land on the south side of the tracks from the residence and main portion of the farm on the north side. In going from the residence to the pasture land, Nichols used the private crossing or · roadway which runs approximately north and south, at right angles to the railroad. At the time of the accident he was in the act of driving his cattle from his residence, on the north side of the tracks, across the railroad tracks to the pasture land on the south. This was a part of his daily routine and he was quite familiar with the crossing.

A westbound train, such as that with which we are concerned, approaches the crossing on a right-hand curve. To the right, or north, is a hill which obscures the crossing until the front of the engine reaches a point 925 feet away. From this point to the center of the crossing the tracks

are approximately straight and the view of the crossing is unobstructed.

As a pedestrian proceeds southwardly along the road leading from the farmhouse to the crossing, his view to his left—that is to the east, the direction from which the train came—is obscured by the hill which, as has been said, extends along the north side of the right of way. When he reaches a point 22½ feet from the nearest rail he has a clear view of the tracks 225 yards to the east, or to his left. He is, of course, visible for the same distance to one who is on the tracks to the east.

The only eyewitnesses to the accident were the engineer and the fireman who were called and examined as adverse witnesses by counsel for the administratrix.

The engineer testified that as the train approached the crossing it was proceeding at about 45 miles per hour; that he was looking out of the cab window on the right-hand side of the engine, while the fireman was looking out of the cab window on the left; that when the engine was between two and three hundred feet from the crossing he saw to his right, on the northern side of the track, several cows approaching the crossing, and that he immediately sounded danger signals of several short blasts on the whistle.

He further said that when the front of the engine was approximately 170 feet from the crossing, Nichols emerged from behind the bank on the right and came into view. Nichols was, he said, some "eight or ten yards" from the track, had a stick in his hand, was running behind the cows, and apparently trying to drive them across the track.

The engineer said that he continued to blow the whistle from the time he saw the cattle until the engine had passed the crossing. In the meantime, as Nichols approached the tracks, due to the projection of the engine in front of the cab, he passed from his (the engineer's) view. The engineer thought that Nichols would stop and not endeavor to cross in front of the train. He did not know, he said,

that the man had been struck until the fireman, who sat on the opposite side of the cab, saw his body thrown to the left or south side of the tracks and reported this to him (the engineer). Immediately the engineer applied the brakes, but due to the momentum of the train, it went approximately one-fourth of a mile beyond the crossing before coming to a stop.

The fireman, who was seated on the left-hand side of the cab, corroborated the engineer's testimony as to the approximate speed of the train and the blowing of danger signals as the engine approached the crossing. As the engine neared the crossing, he said, he saw two or three cows approaching the tracks, but due to his position on the left side of the cab and the proximity of the engine to the crossing, it was impossible for him to see Nichols as the latter approached the tracks on the right of the engine. The first intimation he had of the tragedy was the sight of Nichols' falling body as it was thrown on the left side of the tracks by the passing engine.

Neither witness saw Nichols at the moment of the impact and consequently there is no evidence as to how far he had progressed across the tracks when struck.

The administratrix undertook to show by three witnesses that contrary to the testimony of the engineer, the fireman and other members of the crew, no signal was given as the train approached the crossing.

Mrs. Morgan Farmer testified that she was on the back porch of her residence which is located near the tracks, approximately one-half of a mile west of the crossing. When asked whether a signal was given at the crossing her answer was: "If it blew before it got up to the other side of the crossing, I didn't hear it." She said the only signal she heard was that given quite some time after the accident, and while the train was standing near her home, for the purpose of summoning the train crew to depart.

Mrs. Nichols, the widow of the decedent, said that she was on the front porch of her residence which is located three-fourths of a mile from the crossing; that she heard

a single loud blast of the whistle which "sounded to me like it was close to the crossing," but rather beyond or west of it.

E. J. Nichols, an adult son of the decedent, who was likewise at the residence at the time, said that he heard "one long blast" which "sounded like it was right near the crossing," "or above" it.

It is significant that this latter witness also testified that in addition to the signal he heard the "considerable amount of noise" made by the passing train.

Mrs. Farmer further testified that shortly after the train had been brought to a stop, near her house, she talked to the engineer who said that "he would not have known he hit the man if it hadn't been for the fireman." The engineer denied having made this statement, or even that he had talked with Mrs. Farmer, but, as we shall presently see, this conflict is immaterial.

It may be noted in passing that Mrs. Farmer further testified that during her conversation with the engineer she asked him whether he had blown the whistle, and that he emphatically replied that he had.

Without objection, the trial court instructed the jury that the decedent was guilty of negligence in attempting to cross the tracks in front of the oncoming train, but submitted for their determination whether, notwithstanding the decedent's negligence, the engine crew had the last clear chance to avoid striking him. Despite the verdict of the jury, the trial court concluded that the evidence was insufficient to warrant a recovery under the last clear chance doctrine, and consequently set the verdict aside.

Our sole inquiry, then, is whether the evidence is sufficient to support a recovery under the last clear chance doctrine.

The argument of the administratrix in support of the sufficiency of the evidence runs thus: The engineer's statement or "admission" to Mrs. Farmer that he did not know until the fireman told him that the man had been struck showed that the engineer was not keeping a proper look-

out, and that he never in fact saw the decedent at any time before the impact. The testimony of Mrs. Farmer, Mrs. Nichols and E. J. Nichols warranted the jury in discrediting the testimony of the engineer and that of the other members of the crew that a warning signal was given as the train approached the crossing. The decedent approached the tracks oblivious of the approach of the train. Had the engineer been keeping a proper lookout he could or should have seen the decedent in a position of peril, and could and should have given a warning signal of the train's approach which would have deterred the decedent from going on the tracks in front of the train, or the engineer could or should have applied the brakes and slowed down the train so as to have avoided striking the decedent.

This argument will not, we think, withstand analysis. The burden, of course, was on the plaintiff administratrix to prove the essentials of a last clear chance situation, and this burden she has not, in our opinion, sustained.

In the first place, there is no evidence that the engineer was not keeping a proper lookout, nor any to discredit his statement that he saw Mr. Nichols approaching the tracks. His statement to Mrs. Farmer, if in fact made, does not have this effect. On the contrary, it is entirely consistent with his own testimony. He said that when he first saw Mr. Nichols, the latter was "eight or ten yards" from the nearest rail, and was running toward the crossing. He further said that when the front of the engine, which was traveling at 45 miles per hour, or approximately 66 feet per second, came within 30 feet of Mr. Nichols the projection of the front part of the engine cut off his (the engineer's) view of the man, and that he did not know that the decedent had been struck until he (the engineer) was so told by the fireman, who from his position on the left side of the cab saw the body fall to the left of the train.

Moreover, as has been said, Mrs. Farmer further testified that in her conversation with the engineer he emphatically

stated that a danger signal had been given at the crossing, which, of course, is consistent with his testimony that he was keeping a lookout.

Nor do we think that the testimony of Mrs. Farmer, Mrs. Nichols and her son discredits the direct and positive testimony of the engineer and the other members of the crew that a warning signal of the train's approach was given.

Mrs. Farmer's statement was that "if" the train blew near the crossing she "didn't hear it," and that the only signal she heard was that given some time after the accident while the train was standing near her house. Such negative testimony does not overcome the positive testimony of the crew. *Chesapeake, etc., R. Co.* v. *Jacobs*, 166 Va. 11, 17-19, 183 S. E. 221, 224, 225.

The testimony of Mrs. Nichols and that of her son rather corroborates than discredits the testimony of the crew. Both of these witnesses said that they heard a loud signal near the crossing. The only difference between their testimony and that of the members of the crew is as to the character of the signal given. The engineer said that he gave several short blasts of the whistle, while Mrs. Nichols and her son, who were some three-quarters of a mile away, said that they heard only a single loud blast. A signal of either character would, of course, have been a sufficient warning to a normal person with a clear and unobstructed view of the train.

We think, then, that the uncontradicted evidence establishes that the engineer was keeping a lookout, that he saw the decedent before the latter went on the tracks, and that a warning signal was given as the train approached the crossing.

Furthermore, there is no evidence that the decedent was oblivious of the approaching train. He was, according to his wife's testimony, sixty years of age and in good health. If we accept the testimony of the train crew that the signal was given, the decedent was bound to have heard it. But even if we reject this evidence there are other circum-

stances which show that the decedent must have known of the train's approach.

 It is a matter of common knowledge that a freight train of twenty-five laden cars makes considerable noise. Indeed, the decedent's son testified that he heard the noise of the passing train at the farmhouse which was three-quarters of a mile away from the tracks. Common sense tells us that the decedent is bound to have heard the train.

Again, the accident occurred in broad daylight when the visibility was good. When the decedent was 20 feet from the tracks he had a clear view of the approaching train. It will be remembered, too, that the purpose of his trip was to see that his cattle were driven safely across the tracks into the pasture beyond. He was familiar with the crossing and the frequency of passing trains. In such a situation a normal person would be on the lookout for a train at the crossing. The fact that he was running after his cows and chasing them from the tracks shows that he was conscious of the approaching train and was apprehensive that it might strike one of the animals.

But it is argued that the engineer should have seen Nichols sooner and that if he had done so he could have applied his emergency brakes and slowed down the train and avoided striking him. It is pointed out that when a pedestrian, proceeding in the direction in which the decedent was going, reached a point 22½ feet from the nearest rail, he would be visible to the engineer for a distance of 675 feet to the east, or the direction from which the train came. It is argued that such a distance afforded ample opportunity for slowing the train.

The trouble with this argument is that there is no evidence that when the decedent came within 22½ feet of the track the train was 675 feet away from the crossing.

 It may have been physically possible for the engineer to have seen Mr. Nichols before he says he did. Or, he may have been mistaken in his estimate of the relative positions of the engine and of the decedent when he (the engineer) first saw the man. In accidents of this character

the events happen quickly and there is little time for an accurate estimate of distances. But even if the engineer saw or should have seen the decedent sooner than he says he did, he would have observed that the man was in a place of safety. Unless or until there was some super-added circumstance to charge an ordinarily prudent person with notice that the decedent would leave his place of safety and go on the tracks, the engineer had the right to assume that he would not do so. *Chesapeake, etc., R. Co.* v. *Jacobs, supra* (166 Va., at page 21, 183 S. E., at page 225); *Southern R. Co.* v. *Berry,* 172 Va. 266, 270, 1 S. E. (2d) 261, 262.

██ There is no evidence that after the engineer saw or should have seen the decedent there was any super-added circumstance to show that the man would leave his place of safety, unless it be the fact that he was chasing the cows from the tracks. When the engineer saw this the front of the train was only 170 feet from the crossing. While the decedent could then have stopped instantly and saved his own life, there was nothing the engineer could have done to avert the tragedy.

At the speed of 45 miles per hour, or 66 feet per second, which the train was traveling, less than three seconds were required for it to traverse the 170 feet between the front of the engine and the man. There is no evidence whatsoever that within this time and distance the train could have been stopped or appreciably slowed down. The only evidence on the subject is directly to the contrary. The engineer testified that under the existing conditions, with the application of the emergency brakes, "a little short of quarter of a mile" would have been required to have stopped the train, and that within 170 feet its speed could not have been appreciably slowed. As he explained, the momentum of a heavy train, moving at a rapid speed, is not checked "instantly" or "simultaneously" by the application of the emergency brakes. "It takes seconds to do it."

The facts here are strikingly like those in *Cashell* v. *Southern R. Co.*, 152 Va. 335, 147 S. E. 209, in which we

affirmed a judgment sustaining a demurrer to the evidence. There it was contended that under the last clear chance doctrine a train traveling at 70 feet per second, almóst the same speed as that involved here, might have been slowed down within 250 feet, thereby avoiding a collision. After pointing out that the uncontradicted testimony of the engineer was that it required "about two and two-tenths seconds for the brakes to set in full·in an emergency," we held that this fell short of the necessary proof that the engineer had had a last clear chance, that is, sufficient time and opportunity, to avoid the collision after he discovered or should have discovered the plaintiff's danger.

See also, *Jenkins* v. *Johnson,* 186 Va. 191, 194, 42 S. E. (2d) 319, 320, in which we reaffirmed the principle enunciated in numerous cases that, "The plaintiff is not entitled to recover under the doctrine upon mere peradventure. The burden is upon him to show affirmatively by a preponderance of the evidence that by the use of ordinary care after the peril was discovered the defendant in fact had a last clear chance to avoid the injury. A mere possibility is not sufficient."

We are of opinion that the negligence of the decedent, which continued down to the moment of the impact, was the sole proximate cause of his death. Accordingly, the judgment is

*Affirmed.*