# Richmond

DANVILLE AND WESTERN RAILWAY CO. v. NORMAN CHATTIN
AND ANOTHER.

May 7, 1951.

Record No. 3736.

Present, Eggleston, Spratley, Buchanan and Miller, JJ.*

---

\* Mr. Justice Gregory also sat in the argument of this case, but because of his subsequent death the writing of the opinion had to be reassigned.

The opinion states the case.

*Thomas B. Gay* and *Meade & Talbott,* for the plaintiff in error.

*Fowler & Dodson* and *Sanford & Clement,* for the defendants in error.

BUCHANAN, J., delivered the opinion of the court.

Norman Chattin, plaintiff below, was injured when the automobile in which he was riding was struck by a train of the defendant railway company at a grade crossing. He recovered a verdict and judgment which the railway company here seeks to have reversed on the ground that the negligence of the driver of the automobile was the sole proximate cause of the accident.

The crossing where the accident occurred is about six miles west of Danville. There the single track of the railroad, running approximately east and west, is crossed obliquely from northwest to southeast, the way plaintiff was going, by State Road No. 1132. This road is 13 feet wide and crosses the track at an acute angle of approximately 30° on the right of the car in which the plaintiff was riding.

As the crossing is approached from the northwest, vision of the track to the left, or east, is obstructed by a thick body of pines and undergrowth. A witness for plaintiff said, "It's very much blind until you get up near the crossing." The vision of the track to the right, or west, is also obstructed in some degree.

About seven-thirty o'clock of a dry, clear morning, in February, the plaintiff approached this crossing from the northwest, riding on the front seat of a car driven by his brother, James Chattin. On the right of the back seat was Mrs. Elizabeth Bryan and on her left was her daughter, Mrs. Norman Chattin, plaintiff's wife. Mrs. Bryan was sitting facing Mrs. Chattin and hence looking to her left. As the car cleared the pines and was within 40 to 45 feet of the crossing she, looking east up the track, saw the train "pretty close to us" and holloed, "There's the train." It seemed to her that the driver "put forth every effort to stop and he did stop." When he stopped, however, the right front of his car was too close to the rail. The train cleared the left front, but due to the angle of the crossing, the overhang of the locomotive caught the right front and in the ensuing wreck the plaintiff and the other three occupants of the car were injured, all except Mrs. Chattin being knocked unconscious.

Nobody in the car had seen or heard the train or knew it was coming until Mrs. Bryan called out. It was a heavily loaded train of seven or eight cars, running downgrade, with the power off, or "drifting," as the engineer said, at a speed of 25 to 30

miles an hour, about twice as fast as usual, and from 30 to 40 minutes earlier than usual. It ran 300 yards after striking the car.

The jury's verdict for the plaintiff, it is conceded, establishes as a fact that the statutory signals for the crossing required by section 56-414 of the Code of 1950 were not given; that is, the whistle of the locomotive was not blown and the bell was not rung to give warning of the approach of the train to the crossing as required by that section. That was of course negligence, and if there was causal connection between that negligence and the accident, admittedly the judgment should be affirmed.

The defendant contends, as stated in its brief, that the evidence, viewed in the light most favorable to the plaintiff, as it must be after the verdict, shows that its failure to give the statutory signals was not a proximate cause of the accident and the giving of them would not have prevented it. This contention is based largely on the testimony of the driver, James Chattin, who said, on cross-examination, that he knew of the presence of the train in time to stop; that he stopped where he intended to stop; that he had intended to stop for the track anyway, regardless of whether a train was coming or not, and that the only reason he stopped too close was because he misjudged his distance and failed to appraise correctly the effect of the angle of the crossing.

It is clearly the law that proof of failure to give the prescribed signals and proof of injury, with nothing more, is not enough to entitle a plaintiff to recover. Causal connection between that failure and the injury is an essential element of the plaintiff's case, and the evidence must not leave the question of such connection in the realm of speculation or conjecture, but must afford a basis for legitimate inference in order to constitute a jury question. But if the failure to give the signals promimately contributed to the accident in any degree or in any way, the railway company is liable. *Chesapeake, etc., R. Co.* v. *Barlow,* 155 Va. 863, 872, 156 S. E. 397, 400; *Virginian Ry. Co.* v. *Haley,* 156 Va. 350, 378 ff, 157 S. E. 776, 785 ff; *Southern Ry. Co.* v. *Whetzel,* 159 Va. 796, 167 S. E. 427; *Southern Ry. Co.* v. *Giles,* 169 Va. 218, 222, 192 S. E. 772, 773; *Southern Ry. Co.* v. *Berry,* 172 Va. 266, 270-1, 1 S. E. (2d) 261, 263.

The accident here was of such nature as the statutory

signals were designed to prevent, and if the evidence tends to establish facts and circumstances from which it may be fairly inferred that there is a reasonable probability that the accident would not have happened if the signals had been given, then the question of causal connection is one of fact to be determined by the jury. *Virginian Ry. Co.* v. *Haley, supra,* 156 Va. at p. 382, 157 S. E. at pp. 786-7.

The evidence, viewed in the light most favorable to the plaintiff, showed the following facts and circumstances relating to the accident: The occupants of the car had no warning that the train was coming. None of them heard it or saw it until the car was clear of the obstructing pines. The driver was not expecting the train. It was coasting downgrade at 25 to 30 miles an hour, twice as fast as usual, and ahead of its usual time. Mrs. Bryan, sitting on the right-hand side of the back seat, and facing to her left, first saw the train and called out a warning. The car was then making about 20 miles an hour and was only 40 to 45 feet from the crossing. The train was then within 100 to 150 feet of the crossing. At the warning the driver first looked to his right down the track, in the opposite direction, and then to his left and saw the train for the first time. It seemed to Mrs. Bryan that he then put forth every effort to stop. He was already slowing down, and after she holloed he slowed down more and "it appeared to me he tried to stop." In making the stop the wheels did not slide nor the car skid and the brakes were in good order. The occupants of the car were accustomed to driving in the car with James Chattin to Dan River Mills, where they worked, and where they were going on this occasion. They were familiar with the crossing and it was the driver's habit to stop for it whether a train was there or not.

The car made a complete stop and just as it stopped the train struck it. Two of plaintiff's witnesses, standing some distance back, thought the car was still in motion when it was hit. The plaintiff testified that when Mrs. Bryan holloed the driver applied his brakes and made an effort to stop. He had no time to get out and thought the car had stopped in the clear, "what time I had to think, I thought he was in the clear." He testified that the whistle of the train blows so you can hear it and he would have heard it on this occasion if it had blown.

The defendant argues that the testimony of the occupants of the car, including the driver, shows a complete lack of emer-

gency, and that the accident resulted from the driver's failure to stop in a position of safety after he had seen the train in abundant time to stop. The jury could well conclude that there was much less than abundant time. The driver, who was looking to his right, first learned of the approaching train through Mrs. Bryan's warning, when his car was only 40 to 45 feet from the track, going at 20 miles an hour. On that basis he had about a second and a half to react to the warning and get his car stopped. A State trooper, introduced by the defendant, testified that under such road conditions as prevailed at the crossing, with brakes in proper condition, a car going at 20 miles an hour can be stopped in 43 feet, including reaction time. That gives substantial support to the evidence for the plaintiff that after Mrs. Bryan cried out, the driver put forth every effort to stop. Added to this is the evidence that practically at the instant the car stopped it was struck by the train.

The facts and circumstances refute, rather than require, the conclusion that the driver, within the very short time and space available to him after he saw the train, picked out a place to stop and stopped there, and that the accident was due solely to his mistaken judgment that the place selected was far enough away from the track for the train to pass. It would be more than rare to find a driver reacting in that fashion on suddenly seeing a train bearing down upon him at a crossing. The instinct of self-preservation would ordinarily be too strong to allow it.

The evidence as a whole is contradictory of the statements of the driver on cross-examination, relied on by the defendant, that he knew of the presence of the train in time to stop and stopped where he intended to stop, thinking he was clear of the track. The driver, James Chattin, was a co-defendant with the railway company to the plaintiff's suit. He was testifying as a witness in his own behalf, and the plaintiff was not bound by his evidence. Moreover, the statements relied on by the defendant were not all he said.

He testified on direct examination that since the accident he had stepped off the distance and found that "you have to get within about 30 feet of the track before you could see on account of the pines," measured from the center of the track, and because of the angle the right wheel would be closer than that; that when his right wheel was on the near rail his left wheel would be 12 feet back. He said that when Mrs. Bryan called out he

looked to his right and when he looked to his left there was the train right on the crossing and he applied his brakes and stopped. He said that if he had heard the bell or the whistle he would have stopped farther back. He was asked why he got so close before he stopped, and his reply was: "You have to get so close before you can see down there and I was just getting up there to see, and by not hearing the train, it was just on me before I noticed."

The defendant says his statement that he would have stopped sooner if he had heard the whistle or the bell is only conjecture. We think it is more than that, and that the jury had a right to conclude from all the facts and circumstances of the case, weighed on the scales of experience and measured by ordinary human conduct, that he would have done so. Such reaction would have been in keeping with this observation made by the present Chief Justice in reference to related facts in *Southern Ry. Co. v. Whetzel, supra,* 159 Va. at p. 807, 167 S. E. at p. 430:

"It is a matter of common knowledge that the shrill blast of a locomotive whistle or the continued ringing of a large bell is more easily heard than the roar of an approaching train, and travelers possessed of average hearing usually heed such warnings. The statute is based upon this fact. The evidence establishes that the occcupants of the automobile were in a position to hear and heed the statutory signals if they had been given. According to the ordinary experience of mankind, the jury were warranted in the conclusion that the injury would not have occurred had the statutory signals been given. The trial court approved the verdict, and the plaintiff in this court is entitled to every reasonable inference fairly deducible from the evidence."

Proximate cause, or the relation of negligence to accident, is usually a question of fact for the jury. Only when reasonable men should not disagree on the proper inferences to be drawn from the facts proved is it a question of law. *Scott* v. *Simms,* 188 Va. 808, 816, 51 S. E. (2d) 250, 253; *Crist* v. *Fitzgerald,* 189 Va. 109, 119, 52 S. E. (2d) 145, 149.

The jury had a right to decide upon the evidence that the failure of the defendant to give the signals required by law proximately contributed to the accident, and accordingly the judgment is

*Affirmed.*

MILLER, J., dissenting.

I am in accord with the principles of law announced in the majority opinion but cannot agree that the facts and circumstances in evidence establish causal connection between the negligence of appellant and the collision. On the contrary, I think affirmative, convincing and uncontradicted testimony distinctly discloses that the automobile driver's independent act (found by the jury to be negligence and a proximate cause of the collision)[1] intervened and was the sole proximate cause of the mishap.

My disagreement with the majority opinion being with regard to the application of settled principles of law to the evidence, that part of the testimony which I think negatives causal connection between appellant's negligence and the collision and conclusively establishes the negligence of the driver of the automobile as an intervening and the sole proximate cause of the injury of appellee will be hereinafter set out in detail.

It is to be remembered that failure to give the statutory signals required by section 56-414, Code, 1950, and proof of injury, without more, will not sustain a recovery. Proof of causal connection between failure to give the signals and the injury is an additional and essential element that must be established as a fact or be justly inferrible from the facts and circumstances proved before liability is incurred. *Virginian Ry. Co.* v. *Haley,* 156 Va. 350, 157 S. E. 776; *Simon* v. *Southern Ry. Co.,* 96 Va. 152, 31 S. E. 7; *Chesapeake, etc., R. Co.* v. *Barlow,* 155 Va. 863, 156 S. E. 397.

Nor is the evidence sufficient to establish causal connection between the omission to give the signals and the collision if it merely shows a possibility that the accident would not have occurred had the signals been given. To impose liability upon that character of evidence would be establishing proximate cause by surmise and conjecture and not on facts and circumstances proved and legitimate inferences therefrom.

For a fair appraisal of the testimony bearing upon the vital requirement of causal connection, it is well to know what is revealed by an accurate map of the crossing and surrounding area which was made by an independent surveyor, and filed in

---

[1] Verdict and judgment in favor of appellee against the driver of the automobile was rendered in this proceeding and an appeal applied for but denied.

evidence. From this map it appears that at a point in the highway one hundred feet west of the center of the track at the crossing a train approaching from the east could be seen when it was three hundred feet from the crossing. Standing in the highway fifty feet west of the center of the track at the crossing a train could be seen coming from the east when it was five hundred and thirty feet from the crossing.

James W. Chattin, driver of the automobile, gave this account of what transpired as he approached the track at the very moderate speed of ten to twenty miles per hour:

"Q. When did you first know that a train was approaching?

"A. Well, I heard Mrs. Bryan say, 'there is the train', and I was conscious of it then.

"Q. At the time she saw it, you were conscious of it?

"A. Yes, sir.

"Q. What were you doing?

"A. I was slowing down then and I just applied my brakes and stopped.

"Q. When you stopped, did you think you were in the clear?

"A. Yes, sir.

"Q. Had you reached the tracks then?

"A. No, not then.

"Q. When you stopped you had not reached the tracks?

"A. No, sir.

"Q. At what point on the road do you think you were going about ten miles an hour?

"A. I was probably 40 or 50 feet from the tracks when I was going between ten and fifteen.

\*     \*     \*     \*     \*     \*

"Q. When she spoke, how fast were you going?

"A. About fifteen miles an hour.

"Q. Did you intend to stop for that track?

"A. Yes, sir.

"Q. Regardless of whether any train was coming or not?

"A. Yes, sir.

"Q. You were going to stop anyway?

"A. Yes, sir.

"Q. And the only reason you stopped too close was because you misjudged your distance?

"A. That's the only fault I see.

"Q. You were going to stop regardless?

"A. Yes, sir.

"Q. Regardless of whether a train was coming, you were going to stop?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. Didn't you know the railroad crossed there at an angle?

"A. I would never have thought it was so much.

\* \* \* \* \* \*

"Q. You stopped your car as soon as you intended to stop, but because of that curious angle, the train hit you?

"A. Yes, I stopped it.

"Q. You stopped right where you intended to stop, didn't you?

"A. Yes. She said, 'There is the train', and I applied my brakes.

"Q. You had already slowed down, and as soon as she said, 'There is the train', you stopped?

"A. Yes, sir.

"Q. And that was from 40 to 45 feet from the track?

"A. Yes, sir.

"Q. You had plenty of time to stop, but because of that curious angle, your right wheel got out there too far?

"A. I was judging from the left wheel, and I never thought about the right one.

\* \* \* \* \* \*

"Q. You stopped where you intended to stop?

"A. Yes, I thought I was clear of the track.

"Q. You knew of the presence of the train in time to stop all right?

"A. Yes, sir.

Appellee, Norman Chattin, gives this account of the circumstances immediately prior to and attending the collision:

"A. After James came over to get us, we were driving along the highway about 25 or 30, and just as he reached the crossing, he began slowing down before he reached it, and some distance back, Mrs. Bryan gave a warning, she said, 'There's a train', and immediately after that, I looked to my right, and just as I looked back from it to the left, I saw it coming, and James came to a complete stop, and I thought he had stopped just in time

for it to have missed us, and just as he stopped, it struck, and I was knocked unconscious.

\* \* \* \* \* \*

"Q. After you saw this train and saw your situation, could you tell me about how far the train was up the track, when you saw it?

"A. You mean after Mrs. Bryan said, 'There's a train'?

"Q. Yes.

"A. I would say it was 150 to 200 feet down the track.

"Q. What speed would you say you were traveling at the time Mrs. Bryan observed the train coming?

"A. I would say around 15 to 20, then, when she warned him.

\* \* \* \* \* \*

"Q. Now, Mr. Chattin, did you and James, before this accident, go over that crossing practically every day?

"A. Yes, we had to cross it every day.

"Q. What was his habit there? Did he make a habit of stopping at that crossing to look or listen?

"A. Yes, sir.

"Q. How far from the track did he stop?

"A. I don't know how far he stopped; he just stopped clear of the track.

"Q. He always stopped, whether a train was coming or not?

"A. Yes, sir.

"Q. Always did, whether there was a train coming or not?

"A. He obeyed the sign.

"Q. All the time.

"A. I don't know, but every time I was with him he did.

"Q. It was his habit to stop whether there was a train there or not?

"A. Yes, sir.

"Q. On this day when there was a train, he didn't stop?

"A. He just didn't stop in time. He was too close."

Two other occupants of the car testified and gave their accounts of how the driver proceeded up to and stopped near the track. Elizabeth Bryan said:

"Q. How fast was he going then?

"A. I think he was making about 20 miles an hour when I first saw the train.

"Q. You think he approached that crossing within 40 to 45 feet, still going 20 miles an hour?

"A. I think he was.
"Q. You don't think he slowed down until you spoke?
"A. Yes, he was faster than that before I spoke.

\* \* \* \* \* \*

"Q. You think James intended to slow down, intending to stop, about 40 feet from the tracks?
"A. Yes, sir.
"Q. Did his brakes slide?
"A. No, sir.
"Q. Wheels slide?
"A. No.
"Q. Did the car skid?
"A. No."

The testimony of Bernice Chattin also discloses that the automobile was under complete control and appeared to have been deliberately stopped where the driver intended, uninfluenced by the train's approach. She said:

"A. As we approached the crossing, he slowed the car to around ten miles and hour and mother said: 'Here comes a train', and I looked to my right and then back to my left, and he was stopping, and I thought he had stopped so we were clear, but by that time the train had hit us.

\* \* \* \* \* \*

"Q. And you looked ahead?
"A. And then turned to my left.
"Q. And where was the train then?
"A. I would say 100 or 150 feet away.

\* \* \* \* \* \*

"Q. When *you* mother told him the train was there, how fast was he going?
"A. About fifteen.
"Q. And you weren't uneasy, you thought he could stop?
"A. Sure, I thought he had stopped."

The recitals of these four witnesses of the circumstances immediately preceding and obtaining at the time of the collision give a factual account and clear picture of how and why the mishap occurred. The testimony of the three witnesses other than appellee is not in conflict with his testimony and the testimony of all four when considered together definitely pin-points the real and sole proximate cause of the mishap. Their account of both how and why it happened is direct, unequivocal, and inclu-

sive. It leaves no room or justification for inference as to what caused the collision. The car's contact with the train was not because the driver could not stop after he saw the train, but simply because he miscalculated the intersection angle and thus placed his vehicle too near the track. The sum total of this evidence negatives any just inference that failure to give the statutory signals was a cause of the car's dangerous proximity to the track and conclusively shows that the driver's negligence was an intervening and the sole cause of the accident.

I think it may be fairly said that the testimony of each and all of the occupants of the car discloses that no emergency confronted the driver from the time he was apprised of the presence of the train. This was, no doubt, due to the fact that he intended to stop whether a train was coming or not and was slowing down preparatory to making the stop in any event. There is nothing that can be relied on in the evidence to indicate that the situation would have been different or that the driver would have acted otherwise had the signals been given. I attach no probative value to the driver's obvious afterthought and statement given when asked what he would have done if he had heard the train's whistle or bell as he approached the crossing. It was that he "would have stopped quicker, I guess, because I would have stopped sooner." I am unwilling to rely upon the random "guess" of this witness as to what he might have done under those circumstances and thus attempt by speculation and surmise to supply the necessary causal connection between the railroad's negligence and the collision. His guess and our guess, i. e., two guesses, do not add up to "causal connection."

Here the collision did not occur because of failure to give the signals or because James W. Chattin was not sooner apprised of the train's approach, but because in stopping he misjudged the acuteness of the angle and thus placed his car too near the track. What he did and what he omitted to do show that the real cause of the accident was his miscalculation of the angle of the intersection and not appellee's negligent omission to give the statutory signals. Clearly, then, that independent act and negligence of the driver intervened as the sole efficient cause of the accident and thus insulates the prior and more remote negligence of the railroad company as a proximate cause.

In the case of *Spence* v. *American Oil Co.*, 171 Va. 62, 197 S. E. 468, 118 A. L. R. 1120, this court said:

"* * * The law of proximate causes requires an unbroken sequence between the prime act of negligence and the injury; and where it appears that an active cause intervenes, the prime act will not be deemed the proximate cause unless the intervening act was itself a result reasonably to have been expected from the prime act, and hence negligent approach of a railroad train to a crossing was not the proximate cause of a collision with an automobile the driver of which saw the train in time to have stopped, and would have done so except that his brakes failed to work. *Keel* v. *Seaboard Airline Ry.,* 122 S. C. 17, 114 S. E. 761." (171 Va. at pp. 74, 75.)

"An intervening cause which breaks the chain of causation becomes the sole proximate cause and supersedes the antecedent negligence of a defendant." *Roanoke Ry., etc., Co.* v. *Whitner,* 173 Va. 253, at p. 258, 3 S. E. (2d) 169.

"Where a second tort-feasor becomes aware, or by the exercise of ordinary care should be aware, of the existence of a potential danger created by the negligence of an original tort-feasor, and thereafter by an independent act of negligence brings about an accident, the condition created by the first tort-feasor becomes merely a circumstance of the accident, but is not a proximate cause thereof. The original negligence of the first tort-feasor is legally insulated by the intervening independent negligence of the second tort-feasor, and the latter becomes the sole proximate cause of the accident." *Hubbard* v. *Murray,* 173 Va. 448, at pp. 455-56, 3 S. E. (2d) 397.

The cases of *Virginian Ry. Co.* v. *Haley, supra,* and *Southern Ry. Co.* v. *Whetzel,* 159 Va. 796, 167 S. E. 427, are relied upon by appellee and cited and quoted from in the majority opinion. I think it however sufficient to say that in both of those cases the drivers of the automobiles never saw or were apprised of the presence of the train until their vehicles were upon the track. And in neither instance did the driver have time to stop after being aware of the presence of the train or did they intend to stop for the track regardless of whether a train was approaching or not as were the circumstances in the case at bar. In discussing the *Haley Case* in his brief, appellee says: "Neither the plaintiff nor the driver saw, nor heard the train until they were on the track." That statement is borne out by the facts of the case.

In the *Whetzel Case* we find a like statement: "There is no

evidence tending to show that Grant Whetzel or the operator of the automobile were aware of the approaching train. * * *''

Though the principles of law involved in those cases are the same as in the one at bar, yet due to factual differences they are not controlling of the ultimate result that should be reached on this appeal.

I am of opinion that the case should be reversed and final judgment entered for appellant.