Geraldine Gilbert DEAN, Administratrix of the Estate of Oscar Lee Dean, Deceased, Plaintiff-Appellee,

v.

SOUTHERN RAILWAY COMPANY and Anthony Raines, Defendants-Appellants.

No. 15259.

United States Court of Appeals Sixth Circuit.

Feb. 15, 1964.

Robert T. Winston, Jr., Norton, Va., and Harry N. Fortune, Johnson City, Tenn., Greear, Bowen, Mullins & Winston, Norton, Va., Simmonds, Bowman & Herndon, Johnson City, Tenn., on brief, for defendants-appellants.

John F. Dugger, Morristown, Tenn., H. M. Bacon, Morristown, Tenn., on brief; Bacon & Dugger, Morristown, Tenn., of counsel, for plaintiff-appellee.

Before CECIL, Chief Judge, MILLER, Circuit Judge, and DARR, Senior District Judge.

DARR, Senior District Judge.

This appeal is from a judgment for $18,000 entered on the verdict of a jury against Southern Railway Company and its engineer, Anthony Raines, for the alleged negligent death of Oscar Lee Dean as a result of a collision between Mr. Dean's truck and a train of defendant company at a public highway crossing in a rural area in Lee County, Virginia. The public highway is known as U. S. Highway 23. The parties will be hereinafter referred to as plaintiff and defendants as they stood in the trial court unless otherwise indicated.

Plaintiff's intestate, her husband, Mr. Dean, was an employee of the Burnett Poultry Company of Morristown, Tennessee, his job being to deliver by truck his employer's merchandise to points in Eastern Kentucky. His regular route took him to Harlan, Hazard, Neon, Whitesburg and Cumberland, Kentucky from Morristown, Tennessee.

Mr. Dean, in his regular schedule of work, was not to make a trip on March 28, 1961, but there being a special order from a customer in Neon, Kentucky, he left Morristown on that date about 1 a. m. to make the delivery. While en route to make the special delivery and about 3:40 a. m. the accident happened which resulted in his death. Mr. Dean was driving north on U. S. Highway 23 and defendant company's train was traveling toward the west at and just before the time of the collision.[1] Therefore, the left side of the train was toward

1. Directions indicated are not true directions, are approximate, and are those used in the trial.

Mr. Dean's truck as it approached the crossing and Mr. Dean would have had to look to his right to observe the approaching train. The highway was practically level in the vicinity of the crossing and was straight for some one-half mile south of the crossing. The highway consisted of two lanes of traffic, one for southbound vehicles and the other for northbound. The defendant company has only one track going over the grade crossing. Before reaching the crossing and at the crossing there is a slight curve in the railroad track and it is downgrade. At the crossing the north rail was slightly higher than the south rail, indicating that the bend of the curve was to the north.

■ The grade crossing where the accident occurred is known as Harvey's Crossing and, as heretofore stated, is situated in Lee County, Virginia. Therefore, the law of Virginia controls the substantive question of liability.

■ One charge of negligence that plaintiff claims was the cause of the death of her husband is the allegation that the whistle [horn] was not blown or the bell rung as the train approached the crossing in compliance with the Virginia statute, Code section 56–414. This section of the Code provides:

"Every railroad company shall provide each locomotive or Diesel engine passing upon its road with a bell of ordinary size and steam whistle, or horn, and such whistle or horn shall be sharply sounded outside of incorporated cities and towns at least twice at a distance of not less than three hundred yards nor more than six hundred yards from the place where the railroad crosses upon the same level any public highway or crossing, and such bell shall be rung or whistle or horn sounded continuously or alternately until the engine has reached such highway crossing, and shall give such signals in cities and towns as the legislative authorities thereof may require."

To carry the burden of proof on the bell and whistle statute, the plaintiff introduced only two witnesses, Mr. and Mrs. Jessee. The Jessees lived in the back of their filling station, which is situated, according to Mrs. Jessee, about 250 feet south of the grade crossing [2] and about 75 feet east of U. S. Highway 23. She testified that she had a sick baby and was up with it about 3:00 o'clock in the morning of the accident and had gone back to bed and that she was not sure whether she had fallen asleep when she heard the noise of the collision. She was asked:

"Q. Mrs. Jessee, did you ever hear a whistle or a bell blow before you heard the noise that you told us about?

"A. No, sir, I never."

This is the entire testimony of Mrs. Jessee as to the sounding of the whistle and ringing of the bell.

Mr. Arthur Jessee said that he did not hear any whistle blow or bells ring. He was asked if, after he woke up, he heard any whistle blow or bells ring and his answer was:

"No, sir, I didn't. Well, not knowing—something stirred me. I don't know whether it was that. It was bound to have been that. I won't say for sure. I wasn't what you would say plumb asleep. Anyhow, I was disturbed."

On cross examination he further said:

"Q. Mr. Jessee, you were in bed asleep when the accident happened?

"A. Yes, I said I was in bed asleep.

"Q. And your wife woke you up?

"A. Yes. It was that collision or something. Anyhow, she spoke to me. Told me—".

■ The vague and indefinite testimony of both Mr. and Mrs. Jessee scarce-

2. The plat in evidence is drawn to scale and shows that the filling station is about 150 feet south of the crossing.

ly reaches any area of evidence but, if so, it is clearly negative testimony. Under Virginia law and generally, purely negative evidence has no probative value as against the postitive testimony of credible witnesses. Southern Ry. Co. v. Barden, 200 Va. 98, 104 S.E.2d 13; Norfolk & Portsmouth Belt L. R. Co. v. C. F. Mueller Co., 197 Va. 533, 90 S.E. 2d 135; Atlantic Coast Line R. Co. v. Bowen, 192 Va. 162, 63 S.E.2d 804.

The defendants introduced evidence of a positive nature. The defendant, Anthony Raines, the engineer, testified that he turned the automatic bell on and started blowing the whistle at the whistle board; that he blew one long, another long, a short and a long; that the whistle was blowing up to the time the fireman hollered to him to put on the emergency brake; that the bell was ringing all the way through and was still ringing when the train stopped after the accident.

The fireman on the engine, R. L. Leonard, testified that the engineer blew the whistle at the whistle board and that the bell was turned on. He further testified that the engineer blew the whistle from the time he got to the whistle board until the time he got to the crossing, or until he shouted to him to put on the emergency brake. Also, he said the bell was still ringing when the train stopped.

Albert Huff, the head brakeman, testified that he was riding on the rear unit of a five unit diesel engine; that while the train was running it was his duty to look back and "watch for hot boxes and broke journals" on the moving train, and he was so doing at the time of the collision; that the first time he had any knowledge that something was wrong was when he heard the air go in emergency; that he did not see the collision; and he testified that before the collision he heard the whistle blowing but that he was too far back to hear the bell.

Clyde Caldwell, a witness for the defendants, testified that he lived about 400 yards from Harvey's Crossing. He stated that he worked at a dairy and got up at 4:00 o'clock in the morning; that on the morning of the accident, and be-fore his alarm clock went off at 4:00 o'clock, he heard the train blowing its whistle and heard the impact of the collision.

R. B. Rust, a witness for the defendants, testified that the distance from the whistle board to the crossing, in the direction that the train was traveling, measured 1790 feet to the near edge of the crossing and approximately 1810 feet to the center of the crossing.

■ An analysis of the evidence, as outlined above, and the applicable law result in the conclusion that the plaintiff offered no credible evidence to establish that the bell and whistle statute [Virginia Code, section 56–414] was not observed on the occasion of the collision causing the death of Oscar Lee Dean. But, on the other hand, the only credible evidence is that the horn was sounded more than twice and that the bell rang continuously from the whistle board until the train reached the crossing, in full compliance with the statute.

■ A second cause of action, or a charge of actionable negligence, put forth by the plaintiff is that the defendants failed in their duty to the deceased in the operation of the train as required by the common law.

■ The duty of the defendant company, under the common law as recognized in Virginia, is stated as follows:

"The sole duty of a railroad company with respect to warnings at a crossing, is to give an approaching motorist who, himself, is exercising due care for his own safety, a reasonable and timely warning of the approach of a train." Norfolk and Western Railway Co. v. Sykes, 200 Va. 541, 106 S.E.2d 734, 740.

It has been pointed out heretofore that the undisputed proof reveals that just prior to the collision, when some 600 yards from the crossing, the horn of the diesel engine began blowing and blew one long, another long, a short and a long whistle and that the bell was continually ringing from the whistle board until after the time of the collision.

A Virginia case sustains the proposition that it is a matter of common knowledge that the loud horn of a diesel and the continued ringing of a bell can be heard by travelers possessing average hearing and that travelers usually heed such warnings. The horn on a diesel engine is penetrating and can be heard for long distances. Danville & W. Ry. Co. v. Chattin, 192 Va. 216, 64 S.E.2d 748, 751.

In addition a standard headlight was burning, throwing light down the track and several other lights were burning on the engine.

Mrs. Jessee undertook to estimate the speed of the train after the collision occurred by the sparks emanating from the wheels because of the application of the brakes. She said from this, she estimated the speed to be 35 to 40 miles an hour. After the Court explained to her the qualifications she should have in order to estimate the speed of the train, she said, "Well, guessing at it, about 35 or 40" [m.p.h.]. On cross examination she was asked:

"Q. How are you able, if you don't drive a car, to tell the speed of a train?

"A. I said I couldn't."

Mr. Jessee said that when he saw "the fire flying from the wheels and when the caboose went by, I would say it was possibly making between 30 to 35 miles."

Mr. Leonard, the fireman, testified: "I guess 20 to 25 miles or 30 miles per hour."

The defendant engineer, Mr. Raines, testified that he looked at the speedometer on his engine when he passed the whistle board and the train was going 28 miles an hour. He explained that coming down the long grade he had adjusted his brakes, dynamic and automatic brakes together, and went down the hill at the same speed all the way. Thus, his testimony is that the train was going 28 miles per hour at the time of the collision.

This was a heavy train with five engines, or a five unit engine, with 56 cars loaded with coal. Before it stopped af-

ter the collision it went some distance. The only proof in the record is that the train made a "good stop."

The speed of a train at a crossing is not in itself negligence per se. Seaboard Air Line Ry. Co. v. Crowder, 191 Va. 635, 643, 62 S.E.2d 227, 231.

After passing obstructions that might have prevented him, Mr. Dean could have plainly seen the train when he was at a point 150 feet from the crossing, the train being 165 feet, or less, therefrom, as revealed by the map drawn to scale.

Under all these circumstances, we believe that the undisputed proof reflects that the train was traveling at a reasonable rate of speed at this country grade crossing.

The engineer was sitting on the right side of his engine and from his position he could not see clearly to his left in the direction from which the truck came. The only proof on this question was by fireman Leonard, who, when he was asked if the engineer could see to his left, said, "not too good, no." At the time the truck approached, he was looking straight ahead and did not see it. The fireman, who sat on the left side, saw the truck, as he said, 100 to 150 feet before it came to the crossing and could not tell how fast it was coming. He said he thought the truck would stop, which he had a right to assume. Nichols v. Southern Ry. Co., 187 Va. 89, 45 S.E.2d 913; Virginian Ry. Co. v. Bacon, 156 Va. 337, 157 S.E. 789. But when the truck came within about 25 feet of the crossing he realized that it was not going to stop and yelled to the engineer to "shoot the brakes," meaning to put on the emergency, which the engineer did, but the truck came right on into the left front of the engine, resulting in the death of Mr. Dean.

The fireman waiting until the truck came within 25 feet of the crossing before yelling to the engineer to put on the emergency brake must be judged to have been reasonable and prudent under the circumstances. As heretofore stated, the fireman testified that he saw the truck coming from 100 to 150 feet up the

highway [actually he could have seen it 150 feet as shown by the map]; likewise Mr. Dean could have seen the train approaching with its headlights and other lights on and the horn blowing and the bell ringing when it was 165 feet from the crossing.

There is a Virginia statute requiring a motorist to stop within a minimum of 15 feet from the crossing provided the bell and whistle statute had been observed. Virginia Code, section 46.1–244. Evidently to give motorists warning of this 15 feet, the highway authorities or defendant company had painted two bold white lines across the highway 15 feet from the track. Thus, under ordinary conditions, the fireman had a right to assume that the truck would not proceed further than 15 feet from the crossing.

Anyway the failure of the fireman to call out sooner would not be a proximate cause of the collision. Had he called out when the truck was 50 feet, or more, from the crossing the emergency brake could not have stopped or appreciably slowed the train down; nor would the quicker application of the brakes have been added notice to Mr. Dean of the approach of the train. In the exercise of ordinary care, he could have seen the train from a distance of 150 feet from the crossing and could have heard the bell and horn at a greater distance.

■ The plaintiff contends that liability is set up against the defendants under the doctrine of the last clear chance.

In Greear v. Noland Co., 197 Va. 233, 238, 89 S.E.2d 49, 53, the Virginia law on the doctrine of the last clear chance is stated:

"(1) Where the injured person has negligently placed himself in a situation of peril from which he is physically unable to remove himself, the defendant is liable if he saw, or should have seen, him in time to

avert the accident by using reasonable care. (2) Where the plaintiff has negligently placed himself in a situation of peril from which he is physically able to remove himself, but is unconscious of his peril, the defendant is liable only if he saw the plaintiff and realized, or ought to have realized, his peril in time to avert the accident by using reasonable care." See also Norfolk and Western Ry. Co. v. Hagy, 201 Va. 183, 110 S.E.2d 177.

■ We cannot agree that the doctrine of the last clear chance would apply under the facts in this case. The defendant engineer certainly could not come under the doctrine because he could not see the truck approaching and the fireman was not his agent. The undisputed facts would not place the defendant company under this doctrine. In our view, regardless of the point on the highway where Mr. Dean may have negligently placed himself in a situation of peril, defendant company's employees could not have averted the accident by using reasonable care, that is, if the fireman had called for the emergency brake when Mr. Dean was 50 or 60 feet from the crossing the accident would have occurred anyway. As Mr. Dean continued in a position of peril, the doctrine of the last clear chance would not apply. Whichard v. Nee, 194 Va. 83, 72 S.E.2d 365.

We are satisfied that all credible proof shows that the operators of the train were in nowise guilty of common law negligence which proximately caused the death of Mr. Dean.

■ Another charge of actionable negligence is that the defendant company failed to have statutory warning signal boards at the grade crossing as required by Virginia law.[3] The statute pertinent here is as follows:

"Every railroad company shall cause signal boards, well supported

3. The trial of the case appears to have been conducted as though the defendant engineer was responsible for warning signals on the highway and a general ver-

dict was entered. It is obvious that defendant engineer had no duty to place warning signals on the highway.

by posts or otherwise at such heights as to be easily seen by travelers from both directions of the highway, and not obstructing travel, containing in capital letters, at least five inches high, the inscription 'railroad crossing' * * * and constantly maintained, at each public highway at or near each place where it is crossed by the railroad at the same level." Virginia Code, section 56–406.

Other types of warnings are required at railroad crossings by this statute but only upon order of the State Highway Commission. In this case there was no proof by the plaintiff that the State Highway Commission had ordered lights or reflectors to be placed at this crossing, but to the contrary the defendants established that the Commission had not made such requirement.

There was only one crossing signal at this crossing which conformed to the directive of the statute. This type sign is called in Virginia a "saw-buck" signal. From the map introduced as evidence in this case, the correctness of which is not questioned, this saw-buck warning sign was placed on the north side of the railroad track and on the west side of the highway, closely adjacent to both the railroad track and the highway. There was proof that this saw-buck sign could be easily seen by travelers from both directions of the highway. The pictures introduced in evidence at the trial reveal that a driver of a motor vehicle driving north, as Mr. Dean was, could see the saw-buck signal for more than 347 feet. These pictures were made in daylight. There was no proof offered to show from what distance the headlights of a truck on a dark night would shine on and reflect the saw-buck signal.

The plaintiff contends that there should have been another saw-buck sign on the south side of the track, on the east side of the highway, which would have been directly in front of Mr. Dean as he approached in his truck.

There is nothing to have kept Mr. Dean from seeing this saw-buck sign from such distance back as his lights would reach. The diffusion of the rays from the headlights of a motor vehicle spread over the entire highway and adjacent area. Mr. Dean could have seen the saw-buck sign as it was placed as well as he could have seen another had one been on the opposite side.

We conclude that the placing of one saw-buck signal at a point on the railroad easily seen day or night by travelers from both directions was a compliance with the statute. Virginia Code, section 56–406.

The plaintiff further contends that even if the statute requiring the placing of saw-buck signs at grade crossings was complied with, the defendant company had a further duty, if the circumstances justified, to give more adequate warning under the common law.

We agree that under Virginia law this statement is correct. Ivory Storage Co. v. Atlantic Coast Line Ry. Co., 187 Va. 857, 48 S.E.2d 242.

We are, therefore, called upon to determine whether there is any credible proof to show circumstances rendering the statutory warning signal inadequate in fact.

At the time Mr. Dean approached the crossing on the occasion of the accident at a point of 630 feet from the crossing he passed a sign immediately on his right just off the highway which read "UNEVEN TRACKS." This was a round sign standing on a post some five or six feet high.

Some proof was offered by plaintiff that Mr. Dean could not see this sign because of the glare from the reflectors which were on the end of the bridge railings some thirty feet northward of the sign and from this proof we will assume that he could not have seen this sign. At a distance of some 210 feet from the point where Mr. Dean was free from the glare from the reflectors on the bridge rail, there was another sign, consisting of a round disk, containing an "X" flanked by the letters "R.R." which was also on Mr. Dean's right on a post five or six

feet high. This is the customary highway sign for notice of the proximity of a railroad crossing. Immediately north of this round R.R. sign, there is a sign painted on the east lane of the highway in the form of an "X" sixteen feet long, with "R.R." in the same position as on the round sign. This large "X" is enclosed by two white lines painted across the highway. Both of these signs were plainly visible to Mr. Dean and within the headlight range of his truck. These signs were approximately 370 feet from the crossing. In addition, applying common knowledge, the truck's headlights made the conventional saw-buck sign plainly visible for at least the same distance.

It is true that the warning signals, other than the saw-buck sign, were put up by the state road authorities. The defendant company had no authority to put up signs, except on its right-of-way and there is no proof revealing the width of the right-of-way at the crossing, but the signs put up by the state highway authorities are to be considered as circumstances in measuring the duty of the defendant company.

There was no evidence of probative value offered to establish that this was a dangerous crossing.

It does appear that a traveler moving in the east lane of traffic, as was Mr. Dean, cannot see up the track because of a store building and a filling station until he was within 150 feet of the crossing. However, the two warning signs heretofore described are at a distance of 237 feet from the crossing and the saw-buck signal could have been seen within the range of the headlights of the truck.

The facts concerning the physical situation of the vicinity at the crossing, including the highway and the railroad, are undisputed.

It seems quite likely that had Mr. Dean been looking ahead in the exercise of reasonable care, he would have seen at least one of these warning signals which would have been sufficient notice of the proximity of the railroad crossing.

We think a close question is presented whether as a matter of law there is any evidence to submit to the jury on the question of a violation of the common law duty to adequately mark the railroad crossing. We are inclined to believe that a factual question arises for the determination of the jury. However, since Mr. Dean was guilty of negligence as a matter of law a verdict should have been directed for the defendants.

The seriousness of this case impels us to discuss the disclosures concerning Mr. Dean's conduct at the time of and just before this unfortunate accident.

The proof as to whether Mr. Dean was familiar with the crossing is very scant. Mr. L. E. Burnett, a partner in the Burnett Poultry Company, Mr. Dean's employer, testified that Mr. Dean had only been over this crossing once, traveling southwardly in the opposite direction from which he was driving on the night of the accident. However, he stated that he did not direct the routes to be taken by any drivers, but left that up to them. We will assume that Mr. Dean was not familiar with this crossing, giving all doubt to the plaintiff.

Under Virginia law, whether or not Mr. Dean was familiar with the crossing, he was not relieved from the duty to use his faculties of sight and hearing. He was bound to know that other roads intersect highways as well as railroads, that people travel such intersecting roads and trains move over grade crossings. Charged with that knowledge, the duty evolved upon him to exercise care commensurate with the hazards imposed upon him. Norfolk and Western Railway Co. v. Sykes, 200 Va. 541, 106 S.E.2d 734, 741.

The evidence of probative value disclosed that Mr. Dean left Morristown about 1 a. m. on his way to Neon, Kentucky. He had worked the previous day and had had only about four hours of sleep the night before the accident. He had driven about 85 miles when he ap-

proached this crossing, about 3:40 on a dark night, but it was not foggy or hazy. Some little time prior to his approach to the vicinity of the crossing, he had been driving about 45 miles an hour and it is not clear how fast he was driving when he came near the crossing although it may be inferred that he kept the same speed. As he approached the crossing from several hundred feet back, the train was also approaching the crossing with the horn blowing and the bell ringing. As Mr. Dean moved northwardly and the train westwardly, both toward the crossing, the horn continued to blow and the bell to ring. At a point some 370 feet from the crossing there were two signs, one by the roadside and one on the road and the saw-buck sign at the crossing, all visible. At a point 150 feet from the crossing, Mr. Dean could have seen 165 feet up the track and could have seen the approaching train with the headlight and the other lights on the engine casting their beams and could have heard the bell ringing and the horn blowing. We conclude that Mr. Dean's conduct amounted to negligence as a matter of law.

■ There can be no recovery where negligence of the deceased was either the sole cause or a proximate contribution to the cause of the collision. Norfolk and Western Railway Co. v. Epling, 189 Va. 551, 53 S.E.2d 817, 820; Norfolk and Western Railway Co. v. Sykes, 200 Va. 541, 106 S.E.2d 734, 742.

■ The duty of the trial judge to direct a verdict is governed by state law, not federal law. Gilreath v. Southern Railway Company, et al., 323 F.2d 158 (C.A. 6, 1963) (see marginal note "4"). It is immaterial whether Virginia law or Tennessee law applied for they are the same. Jackson v. The Texas Co., 10 Tenn.App. 235; Hill v. Castner-Knott Dry Goods Co., 25 Tenn.App. 230, 166 S.W.2d 638; Norfolk and Western Railway Co. v. Sykes, supra.

For the reasons heretofore set out, we believe that the trial judge should have directed a verdict for the defendants at the conclusion of all the evidence or sustained the motion for judgment notwithstanding the verdict.

The judgment is reversed and set aside and the cause remanded to the District Court with instructions that a judgment be entered on behalf of the defendants.